(301 P.3d 755)
No. 107,662

PAUL HUNT, *Appellant*, v. STATE OF KANSAS, *Appellee*.

1024

Opinion filed May 24, 2013.

*Jason P. Wiske,* of Law Office of Jason P. Wiske, L.L.C., of Pittsburg, for appellant.

*Natalie A. Chalmers,* assistant solicitor general, *Andrew D. Bauch,* assistant attorney general, and *Derek Schmidt,* attorney general, for appellee.

Before McANANY, P.J., BUSER and STANDRIDGE, JJ.

STANDRIDGE, J.: Paul Hunt appeals from the district court's decision to deny his K.S.A. 60-1507 motion after an evidentiary hearing. Hunt claims the district court erred in denying his ineffective assistance of counsel claims and in denying his claim for relief under *Doyle v. Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Because Hunt fails to establish that counsel was deficient or that he was prejudiced by the *Doyle* violation, we affirm.

## FACTS

In its opinion affirming Hunt's conviction on direct appeal, our Supreme Court summarized the material facts as follows:

"On Sunday, June 23, 2002, family members of Mary Sue Taylor, a resident of Fort Scott, Bourbon County, Kansas, reported to law enforcement that [Mary

Sue] could not be located. [Mary Sue's] vehicle was parked in the driveway, her house was unlocked, the television was on, and items that she would normally take with her were still in the house. Nothing appeared out of the ordinary inside or outside the house. Neighbors reported last seeing [Mary Sue] the morning of June 20. [Mary Sue] had not appeared at her job on June 22 and 23.

"At the time of the disappearance, Hunt and his minor child, Ryan, had been living with [Mary Sue], albeit Hunt and his mother had a volatile, contentious relationship. Hunt told police that he last saw his mother at about 10:40 p.m. on June 20, before he left for work. Upon completing his shift on the morning of June 21, Hunt did not return to his residence before going to the house of his girlfriend, Tammy Rees, in Cartersville, Missouri. His son, Ryan, was also out of town, visiting maternal grandparents. After spending the weekend with [Tammy], Hunt returned to the Fort Scott home about 10:30 p.m. on Sunday, June 23, where the investigation into [Mary Sue's] whereabouts had commenced.

"Several days later, on June 29, [Mary Sue's] body was found floating in a strip pit in Crawford County. The body was wrapped in a gray tarp which was tied with rope and taped, and the tarp-wrapped body was inside a sleeping bag which had also been wrapped with rope and tape. A rope was around the victim's neck. The coroner opined that [Mary Sue] died of ligature asphyxiation and ruled the death a homicide, albeit he could not determine the date of death. The coroner described the manner in which the body had been wrapped and secured with rope and tape as a fairly complicated and involved mechanism.

"Hunt's behavior both before and after the discovery of [Mary Sue's] body caused some suspicion. The weekend of [Mary Sue's] disappearance, Hunt took some of [Mary Sue's] clothing to his girlfriend, saying that his mother wanted the girlfriend to have it. He also brought camping equipment and stored it in his girlfriend's shed. Later testing revealed that two ropes found with the equipment were consistent with the color, construction, and chemical composition of the rope around the victim's neck.

"On the day before the discovery of the body, Hunt and a friend were leaving a convenience store in Missouri when police stopped Hunt's pickup. Hunt declared to his friend: '[M]an, I'm in trouble,' and fled afoot after imploring his friend not to disclose that Hunt was driving. The police did not pursue Hunt, and the friend thought Hunt was concerned about being arrested for driving under the influence.

"The day after the body was discovered, Hunt called his girlfriend to say that he was leaving town. He left his son with a brother but did not tell family members he was leaving. The following day he asked his girlfriend to bring soda and cigarettes to a park in Joplin, Missouri, where he planned to spend the night. He then rode a freight train to Kansas City, but then hitched a ride on a southbound freight train, eventually winding up in Emporia. There, he called his brother, Patrick, on July 4 asking Patrick to get him a motel room and to provide him with a ride back to Fort Scott.

"Hunt did not attend his mother's funeral, ostensibly because his brother, Patrick, and an uncle were accusing Hunt of being the murderer. Hunt subsequently left the Fort Scott area, first going to live with Ryan's maternal grandparents in Missouri. He was in Pennsylvania when he was arrested in March 2005.

"Police also located a witness who had observed a pickup truck parked in a low-lying area, adjacent to a strip pit situated on the Missouri side of the Missouri-Kansas border, near evening on June 20, 2002, the last day that [Mary Sue] was seen alive. The witness, who owned land containing strip pits in the area, proceeded to investigate whether someone was fishing on his land. As the witness approached the pickup, he observed a person initially standing next to the passenger door who then entered the pickup on the driver's side. Upon making contact with the pickup driver, the witness observed a motionless person in the passenger seat covered with a blanket or sleeping bag. In answer to the witness' inquiry, the pickup driver said the passenger was his sleeping fiance. Being suspicious of a person being covered up with a blanket in hot weather, the witness went to the local sheriff's office to report his concerns. At trial, the witness could not identify Hunt, other than to say that he was about the same size as the pickup driver. Likewise, the witness' recollection of the pickup was limited to describing it as being a dark color which comported with the color of Hunt's pickup.

"Because [Mary Sue's] body was discovered in Crawford County, Hunt was tried in that county. The jury convicted him of first-degree, premeditated murder." *State v. Hunt*, 285 Kan. 855, 857-59, 176 P.3d 183 (2008).

At Hunt's jury trial, Agent Frank Papish with the Kansas Bureau of Investigation (KBI) testified on behalf of the State about the 2-day interview with Hunt in Pennsylvania after Hunt was arrested for Mary Sue Taylor's murder. On the first day of the interview, Hunt told Papish he would talk about his mother the next morning and tell Papish what he needed to know. On the second day of the interview, Hunt did not tell Papish what happened to his mother.

Hunt testified in his own defense at trial. During his testimony, the State asked Hunt whether he told Papish everything he knew about the murder of his mother. Hunt responded to the State's question by stating that he asked for an attorney, and Papish left the interview. The district court immediately called a bench conference and asked Hunt's counsel if he wanted an instruction to the jury to disregard Hunt's response. Hunt's counsel declined the request for an instruction. After the State rephrased the question, Hunt replied, "There was nothing to tell."

While cross-examining Hunt's brother Patrick Hunt, Hunt's counsel asked if Patrick requested a warrant to be issued for Hunt's

arrest based on Patrick's belief that Hunt murdered their mother. Hunt's counsel then asked if Patrick was "definitely sure today that [Hunt] killed her." The State immediately objected and no answer was given. Hunt's counsel also elicited testimony from Chris Hollingsworth, Mary Sue's son and another brother of Hunt, stating that several members of the family, including Chris, had believed Hunt was responsible for Mary Sue's disappearance.

The jury ultimately convicted Hunt of first-degree, premeditated murder. After the Supreme Court issued its opinion affirming Hunt's conviction, Hunt filed a motion pursuant to K.S.A. 60-1507 alleging ineffective assistance of trial counsel. At a preliminary hearing on the motion, the district court summarily denied relief on all claims except for the one alleging counsel's ineffectiveness in failing to challenge venue. After an evidentiary hearing on that claim, the court denied Hunt's motion in its entirety.

Hunt appealed and, in an unpublished opinion, a panel of this court affirmed the district court's finding and conclusions on some issues but reversed and vacated the district court's decision on others and remanded the case with directions. Specifically, the panel found that Hunt was entitled to a full evidentiary hearing on his ineffective assistance claims regarding (1) counsel's failure to object on relevancy grounds to Papish's testimony; (2) counsel's failure to object to questions posed by the State to Hunt regarding his meeting with Papish; (3) counsel's failure to request a cautionary instruction after the *Doyle* violation; and (4) counsel's actions in eliciting opinion testimony from Hunt's brothers on the question of guilt. *Hunt v. State*, No. 103,073, 2011 WL 1475778, at *9-10 (Kan. App.) (unpublished opinion), *rev. denied* 293 Kan. 1106 (2011).

The district court held that evidentiary hearing on February 24, 2012. Based on the evidence presented at the hearing, the court found Agent Papish's testimony to be highly relevant outside the scope of *Doyle*; thus, Hunt's trial counsel was not ineffective in failing to object to it as irrelevant. Relying on the Kansas Supreme Court's decision in Hunt's direct appeal, the district court also found that although the State committed a *Doyle* violation in questioning Hunt about the second day of his interview with Papish, Hunt failed to establish prejudice based on his counsel's failure to

object. The district court further found that Hunt's counsel was not ineffective for failing to request a cautionary instruction as to the *Doyle* violation because the decision was based on trial strategy. Finally, the district court concluded that counsel was not ineffective in asking Hunt's brothers whether they thought Hunt murdered their mother because the questions were a matter of trial strategy, and even if counsel were ineffective, Hunt failed to establish prejudice.

## ANALYSIS

On appeal, Hunt asserts the district court erred (1) in finding that Hunt's trial counsel was not ineffective and (2) in finding that Hunt could not establish prejudice from the *Doyle* violation that arose during his cross-examination. Hunt further asserts that even if the individual instances of error are insufficient to grant him relief, the cumulative errors establish that he was deprived of a fair trial.

### 1. *Ineffective Assistance of Counsel*

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. *Thompson v. State*, 293 Kan. 704, 715, 270 P.3d 1089 (2011). After a full evidentiary hearing, an appellate court reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and, if so, whether those factual findings are sufficient to support the court's conclusions of law. An appellate court must give deference to the district court's findings of fact, accepting as true the evidence and any inferences that support or tend to support the district court's findings. *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007). In addition, we give particular deference to the trial judge who observed counsel's performance firsthand. *Chamberlain v. State*, 236 Kan. 650, 659-60, 694 P.2d 468 (1985). Appellate review of the district court's ultimate conclusions of law is de novo. *Bellamy*, 285 Kan. at 354-55.

To establish ineffective assistance of counsel, it is not enough to merely surmise, with the benefit of hindsight, that another attorney

may have tried the case differently. Rather, before counsel's assistance can be found to be so defective as to require reversal of a conviction, the defendant must establish two things. First, the defendant must establish that counsel's performance was constitutionally deficient. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of the totality of the evidence before the judge or jury. Second, the defendant must establish that counsel's deficient performance prejudiced the defense. To establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984); *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009).

a. *Ineffective Assistance of Counsel Related to the Testimony of Hunt's Brothers*

In his first claim of ineffective assistance, Hunt asserts his trial counsel was ineffective for asking Hunt's brothers, Patrick and Chris, for their respective opinions on whether Hunt was guilty of murdering their mother. Notably, testimony in the form of an opinion otherwise admissible is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact. K.S.A. 60-456(d). By way of example, Kansas courts have found that nonexpert witnesses who have been shown to have had special opportunities to observe may give opinion evidence as to sanity and intoxication. *City of Dodge City v. Hadley*, 262 Kan. 234, 240-41, 936 P.2d 1347 (1997) (citing *State v. Shultz*, 225 Kan. 135, 587 P.2d 901 [1978], and *State v. Townsend*, 146 Kan. 982, 986, 73 P.2d 1124 [1937]). But witness testimony expressing an opinion on a defendant's overall guilt or innocence necessarily falls outside the scope of K.S.A. 60-456(d) because it "is inadmissible as a matter of law." *State v. Drayton*, 285 Kan. 689, 701, 175 P.3d 861 (2008). This is because "[i]n a criminal trial, the defendant has the right to have the jury determine from the evidence whether the defend-

ant is guilty or not." *State v. Steadman*, 253 Kan. 297, 304, 855 P.2d 919 (1993).

With these legal principles in mind, we turn to the testimony provided by Hunt's brothers. Patrick testified that he was living in South Dakota when he learned about his mother's disappearance sometime in June 2002. After Chris called Patrick on July 2, 2002, to report that an unidentified body had been found that could be their mother, Patrick drove 12 hours from South Dakota to the Fort Scott area. During cross-examination, Patrick acknowledged that he went to the Fort Scott Police Department on July 7, 2002, to tell Sergeant Curtis Bowman that he believed Hunt murdered their mother and to request that a warrant be issued to arrest Hunt for the crime. Patrick also acknowledged that he met with KBI Agent Bruce Adams the following day, July 8, 2002:

"Q. And that's—did you tell Officer Adams that you suspected Paul Hunt was the person involved in the disappearance and murder of your mother?

"A. I believe my comment was he could be involved, yes.

"Q. And what was the basis for that?

"A. My personal opinion was based on behavior that I had witnessed.

"Q. What behavior had you witnessed that caused you to come to that conclusion?

"A. Several forms of behavior. One of them being leaving, the train incident, you know, running away and that type of behavior, sir, and also comments that he had made to me directly.

"Q. What comments had he made?

"A. One I referred to earlier was one of them. That stands out in my mind. There was—seemed to have been overall disgust that he was showing."

Counsel further cross-examined Patrick:

"Q. Would it be a fair statement that you came to the conclusion very quickly that Paul was guilty?

"A. No sir.

"Q. You don't consider a few days after the body was found that you had already made that decision to be quick?

"A. I had not made that decision at that time, sir, a few days after, no.

"Q. Well, I mean, you requested—

"A. Was there suspicion, suspected, yes. Definite, no.

"Q. Now, are you definitely sure today that he killed her?

"MR. BAUCH: Your Honor, I'm going to object. This is a question for the jury to decide.

"THE COURT: Probably it is irrelevant in any event. I will sustain the objection."

Chris' opinion testimony consisted of the following:

"Q. After your mother was found, did you and Pat[rick] have any discussions about what might have happened to her?

"A. Yes, we did.

"Q. And did any of those involve [Hunt] being responsible?

"A. Yes, it did.

"Q. By the time of the funeral, several of you believed that [Hunt] was the responsible person; is that correct?

"A. Yes."

Based on testimony from Hunt's counsel at the K.S.A. 60-1507 evidentiary hearing that the questions set forth above were asked as a matter of trial strategy, the district court ultimately concluded that counsel was not ineffective for asking Patrick and Chris for their respective opinions on whether Hunt was guilty of murdering their mother. Specifically, the district court concluded that Hunt's counsel had to combat the evidence of Hunt's "exceedingly incriminating and bizarre" actions following his mother's disappearance, like jumping on trains, hiding in the park, not attending his mother's funeral, and making unusual comments. The theory of defense to explain this behavior was that Hunt had discovered his family members believed he killed Mary Sue and that he was experiencing a great deal of stress as a result of those unjust accusations. The judge noted that Hunt's counsel was

"given a certain set of facts and they have to deal with those facts and attempt to mitigate those facts the best they could, and this is the only real way they could play these cards to mitigate the evidence against you, to explain that your actions were premised upon your family's belief that you were guilty, and to explain that this belief came about arbitrarily and very early on in the process before any evidence was even developed to tie you to your mother's murder."

The judge repeatedly suggested that Hunt's counsel did not have much choice and that it would have been a more serious error to have left Hunt's bizarre actions unexplained from which the jury could draw inferences.

In discussing trial strategy, our Supreme Court has explained that strategic decisions made by trial counsel based on a thorough investigation are virtually unchallengeable:

"Trial counsel has the responsibility for making tactical and strategic decisions including the determination of which witnesses will testify. Even though experienced attorneys might disagree on the best tactics or strategy, deliberate decisions based on strategy may not establish ineffective assistance of counsel. Strategic choices based on a thorough investigation of the law and facts are virtually unchallengeable." *Flynn v. State*, 281 Kan. 1154, Syl. ¶ 5, 136 P.3d 909 (2006).

Nevertheless, defense counsel may not "disregard pursuing a line of investigation and call it 'trial strategy.' " *State v. James*, 31 Kan. App. 2d 548, 554, 67 P.3d 857, *rev. denied* 276 Kan. 972 (2003). "[W]hen counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of 'trial strategy' is inappropriate." *Mullins v. State*, 30 Kan. App. 2d 711, 716-17, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002). Upon review, "[s]trategic choices based on less than a complete investigation are reasonable to the extent that reasonable professional judgment supports the limitation on the investigation." *Flynn*, 281 Kan. at 1157.

The district court's finding that trial counsel asked the questions at issue based on trial strategy is supported by sufficient evidence in the record of the evidentiary hearing. Both of Hunt's trial attorneys testified that the questions were based on the trial strategy of explaining Hunt's bizarre behavior. Attorney Philip Bernhart testified that he asked Hunt's brothers about their opinions on whether Hunt was guilty of murdering their mother because he was trying to do two things: (1) to show that Chris' opinion had come about very early on and was not based on rationality, just wild speculation and (2) to explain Hunt's bizarre behavior, "which was a major problem," by showing that it was a response to his family accusing him of being the killer. Bernhart also said that he was trying to show the brothers' bias on the day of the trial. Bernhart explained that the brothers' testimony confirmed Hunt's own testimony that he believed they were accusing him of murder.

Hunt's other attorney, David Clark, also testified that the defense's trial strategy was to explain Hunt's bizarre behavior. Clark said he thought asking the brothers questions about their opinions on whether they had believed Hunt was guilty of murdering their mother was important because it "confirmed that Mr. Hunt's be-

liefs were accurate in terms of his brothers' feelings." Clark also testified that Hunt's anticipated testimony on that issue subsequently would have opened the door for the brothers' testimony to come in anyway; therefore, it was better for the defense to introduce it before the State did in order to characterize it in the best way possible.

Although there is sufficient evidence in the record to support the district court's finding that trial counsel asked these questions based on trial strategy, Hunt argues counsel's actions in effecting that strategy permitted the jury to consider inadmissible opinion evidence regarding his guilt, which necessarily establishes deficient performance as a matter of law. Taken in context, however, we are not persuaded that Patrick's and Chris' testimony amounts to inadmissible opinion evidence.

As set forth above, a witness cannot testify that in his or her opinion the defendant is guilty. See *Steadman*, 253 Kan. at 304. Allowing such testimony invades the jury's role to determine guilt or innocence based on the totality of the evidence presented at trial. Considering the context within which it was offered, however, we find the testimony provided by Patrick and Chris was limited in both scope and time to the perceptions and beliefs they held while the police were investigating the murder in the few days after their mother's body had been discovered. As a result, this testimony did not invade the jury's role to determine guilt or innocence based on the totality of the evidence presented at trial. In so finding, we acknowledge that defense counsel did ask Patrick on the day of trial whether he still believed Hunt killed their mother, but the trial court sustained the State's objection to the question and Patrick was not permitted to respond. Given the narrow context in which Patrick and Chris actually testified regarding their opinions, we are not persuaded that the opinion testimony at issue here invaded the jury's role to determine guilt or innocence based on the evidence presented at trial. Because the testimony was otherwise admissible, defense counsel's strategic decision to elicit such testimony cannot be considered deficient performance.

Even if we had found trial counsel's performance deficient in asking Hunt's brothers for their respective opinions on whether

they believed in the few days after their mother's body was found that Hunt was guilty of murdering their mother, Hunt has failed to establish the second prong of an ineffective assistance of counsel claim: that this testimony prejudiced his defense. Establishing prejudice requires a showing that counsel's errors were so severe as to deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 687; *Harris*, 288 Kan. at 416. Specifically, the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Harris*, 288 Kan. at 416.

Hunt argues the opinion testimony at issue significantly prejudiced his defense because there was no direct evidence of his guilt presented at trial and the circumstantial evidence presented was not overwhelming. Hunt is correct that the evidence in this case was circumstantial and not overwhelming. The Kansas Supreme Court itself said so in Hunt's direct appeal, noting that "by any measure, the State's evidence in this case was not of a direct and overwhelming nature." *Hunt*, 285 Kan. at 874. But a finding that evidence is circumstantial and less than overwhelming falls far short of the standard necessary to establish prejudice here: a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. Based on the following evidence, we do not believe such a reasonable probability exists.

As a preliminary matter, there was evidence presented at the trial that Hunt's odd behavior began *before* his brothers accused him of the murder. Specifically, Hunt's girlfriend, Tammy Rees, testified that Hunt gave her his mother's clothes the weekend that she went missing, claiming that his mother had grown out of them and wanted Tammy to have them—even though Mary Sue had never given Tammy any clothes before and the two women were not that close. Tammy also testified that Hunt brought a large quantity of camping equipment to her house before Mary Sue went missing, which later turned out to include a rope that was consistent with the rope found on Mary Sue's body.

Moreover, Chris testified that right after Hunt learned that his mother went missing, Hunt told Chris, "[I]t will not go to Court." Chris further stated Hunt told him that "if you really wanted to get away with it, you could, if you really wanted to." Finally, Chris testified that while he and Hunt were putting up missing person posters *before* the police discovered Mary Sue's body had been dumped in a strip pit, Hunt commented that "Terry Taylor [Mary Sue's ex-husband] knows every strip pit from here to West Mineral" just as they were nearing the strip pit where Mary Sue's body was later found. The State also presented a witness who stated that, 3 days before Hunt's mother was reported missing, he saw a man near the strip pits in a dark-colored truck, consistent with the color of Hunt's truck, and that the man claimed a motionless person in the passenger seat covered with a blanket was his sleeping fiance.

Although we find the facts set forth above effectively eliminate any reasonable probability that the verdict would have been different if counsel had not asked Patrick and Chris to provide their opinions, there is also additional support for such a finding. Specifically, the particular opinion evidence about which Hunt complains was presented to the jury through two other sources besides his brothers: his own testimony and the testimony of Officer Adams, who testified that Patrick told him he believed Hunt was involved in the disappearance and murder of his mother. In fact, the district court commented at the evidentiary hearing that the brothers' testimony was essentially the "same thing" as Hunt's testimony in that it conveyed to the jury that his brothers thought he was guilty.

Based on the discussion above, Hunt has failed to establish that the opinion testimony provided by his brothers was inadmissible in the first instance; thus, counsel was not deficient for eliciting that testimony as part of the defense trial strategy. And, even if Hunt had established the opinion testimony was inadmissible, Hunt has failed to demonstrate how the outcome of the trial would have been different had the testimony in dispute been presented to the jury only through Officer Adams and Hunt.

b. *Ineffective Assistance of Counsel Related to the Testimony of Agent Papish*

Next, Hunt claims his trial counsel was ineffective for failing to file a motion in limine or to object to the testimony of Agent Papish on grounds that the testimony was not relevant. Again, to support a claim of ineffective assistance of counsel, the defendant must prove that (1) counsel's performance was deficient and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. *Thompson*, 293 Kan. at 715.

Generally, all relevant evidence is admissible. *State v. Patton*, 280 Kan. 146, 156, 120 P.3d 760 (2005), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). There are two elements of relevant evidence: a materiality element and a probative element. *State v. Houston*, 289 Kan. 252, 261-62, 213 P.3d 728 (2009). Evidence is material if the fact is " ' "significant under the substantive law of the case and properly at issue." ' " *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008). Evidence is probative if it has " 'any tendency in reason to prove' " a fact. 286 Kan. at 505. The issue of whether evidence is probative is reviewed under an abuse of discretion standard whereas the materiality of evidence is reviewed de novo. *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010).

As a rule of necessity, however, even relevant evidence may be excluded if the court determines that the probative value of that evidence is substantially outweighed by the risk of unfair prejudice. *Patton*, 280 Kan. at 156 (quoting *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 [2004]). Appellate courts review this determination for abuse of discretion. *State v. Wells*, 289 Kan. 1219, 1227, 221 P.3d 561 (2009).

At the K.S.A. 60-1507 evidentiary hearing on this issue, the district court found that Hunt was *Mirandized*, waived his *Miranda* rights, agreed to talk with Papish, and did not invoke his *Miranda* rights on the first day of his interview with Agent Papish. See *Mir-*

*anda v. Arizona*, 384 U.S. 436, 460, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). The court also found that Hunt's invitation to talk the following day intimated that he knew what happened to his mother, which was relevant and admissible evidence. The court specifically found that Papish's testimony regarding Hunt's intention to talk the following day did not constitute a *Doyle* violation because Hunt had not invoked his *Miranda* rights that first day, had not agreed to talk, and had, in fact, remained silent. The court ultimately concluded that "the first interview conducted between Agent Papish and [Hunt] was admissible, relevant, and did not violate *Doyle* because [Hunt] freely and voluntarily waived his rights."

On appeal, Hunt argues that Papish's testimony about Hunt's intention to talk the following day was irrelevant because Hunt ultimately did not make any statements that could be connected with other evidence to bolster the State's case. As Hunt's own counsel stated at the K.S.A. 60-1507 evidentiary hearing, however, Hunt's statements to Papish were relevant in their own right because they implied " 'if you will come back, I will have something to tell you.' " Even the Kansas Supreme Court noted in Hunt's direct appeal that "[t]he inference to be drawn from that testimony was that Hunt possessed personal information about the murder." *Hunt*, 285 Kan. at 872. This evidence was probative because it had a tendency to prove that Hunt knew something about his mother's death. And Hunt's knowledge about his mother's death was a material fact because Hunt's involvement in the murder was significant under the substantive law of the case and properly at issue.

To that end, both of Hunt's attorneys testified at the K.S.A. 60-1507 evidentiary hearing that they thought there was no legal basis to suppress Papish's testimony. In fact, the district court stated at the evidentiary hearing that "had a motion to suppress of that particular interview been filed by your counsel . . . it would have been denied by the Court because there is simply no basis." Hunt's counsel was certainly not ineffective for failing to bring a motion with no legal basis that would have been denied by the district court. See *State v. Gleason*, 277 Kan. 624, 648, 88 P.3d 218 (2004) (finding that counsel was not ineffective for failing to object to

admissible, relevant evidence that the court would have admitted even if counsel had objected).

For the reasons stated above, the district court did not err in finding no merit to Hunt's claim that trial counsel was ineffective for failing to file a motion in limine or to object to the testimony of Agent Papish on grounds that the testimony was not relevant. Because Hunt failed to establish his counsel's performance was deficient, we do not need to address the prejudice prong of the *Strickland* ineffective counsel test.

## 2. The Doyle *Violation—Hunt's Testimony*

Although he did so in his first K.S.A. 60-1507 appeal, Hunt does not frame the *Doyle* violation as an ineffective assistance of counsel claim but instead as a deprivation of due process. Specifically, Hunt claims the admission of evidence at trial indicating that he invoked his constitutional right to remain silent deprived him of a fair trial; thus he is entitled to a new trial under *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during a custodial interrogation and the right to remain silent. U.S. Const. amend V; *Miranda*, 384 U.S. at 479. Consequently, *Miranda* requires law enforcement officers to inform suspects of these rights before statements—whether exculpatory or inculpatory—made in a custodial interrogation may be admitted against them. 384 U.S. at 444; *State v. Cosby*, 285 Kan. 230, 241, 169 P.3d 1128 (2007). Once a defendant states that he or she wants an attorney, the interrogation must cease until an attorney is present. *Miranda*, 384 U.S. at 473-74. "It is constitutionally impermissible for the State to elicit evidence at trial of an accused's post-*Miranda* silence." *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1998) (citing *Doyle*, 426 U.S. at 618). This violation is called a *Doyle* violation, which occurs when the State attempts to argue or introduce evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers, but instead invoked the

constitutional right to remain silent. *Edwards*, 264 Kan. at 195; *State v. Pruitt*, 42 Kan. App. 2d 166, 172, 211 P.3d 166 (2009).

Agent Papish interviewed Hunt after his arrest over the course of 2 days. On the first day, Papish asked Hunt to "tell me about your mother and what happened," but Hunt said several times that he would talk about it the next morning and tell Papish what he needed to know. When Papish returned the next morning, Hunt invoked his *Miranda* right to an attorney, and Papish left.

During Hunt's trial, the district court suppressed the videotape from the first day of the interview, finding the tape inadmissible because it had no probative value since Hunt did not make any incriminatory statement and Hunt's long periods of silence were unduly prejudicial because they implied that he refused to defend himself when given the opportunity to do so. Nevertheless, the district court ruled that the State would be permitted to "fully explore the conversation [from the first interview day]." With that said, the district court also ruled that Papish would not be allowed to testify that Hunt had invoked his right to an attorney on that second day.

Once on the stand, Papish testified about the first day's interview and Hunt's statements indicating that Hunt would talk with Papish the following day. When asked by the State if Hunt told him what happened to his mother on that second day, Papish responded, "No, he did not."

When Hunt later took the stand, the State cross-examined him as follows:

"Q. Do you recall speaking to Agent Papish out in Pennsylvania after you had been arrested?

"A. I remember some of it, yes.

"Q. And you told him—he asked you I want to talk about your mom's murder and you told him not once, not twice, but three to four times I will tell you everything you want to know about the murder of her in the morning. You told him that, didn't you?

"A. Meaning I would tell him everything I know in the morning, yes.

"Q. Did you tell Agent Papish everything you knew?

"A. After I asked for an attorney, he left me.

"THE COURT: Hold on just a second. Come forward, please."

The district court then called a bench conference, during which Hunt's counsel declined the court's offer for an instruction to the jury to disregard Hunt's response. The court then allowed the State to ask the following:

"Q. Did you tell him everything you knew about the murder of your mother Mary Sue Taylor, yes or no?
"A. There was nothing to tell."

In the context of Hunt's claim of prosecutorial misconduct on direct appeal, the Kansas Supreme Court found that both the State's question to Hunt and his first response constituted a *Doyle* violation, because the question "on its face 'attempts to impeach [Hunt's] credibility at trial by arguing or by introducing evidence that [Hunt] did not avail himself . . . of the first opportunity to clear his or her name when confronted by police officers.' " *Hunt*, 285 Kan. at 872. It explained that "[e]ven in context, the question suggested that Hunt knew something about the murder that he failed to share with Agent Papish and that the jury should discount Hunt's trial testimony because of the unfavorable inference to be drawn from that silence." 285 Kan. at 872. Thus, the court found the question impermissible under the first step of the prosecutorial misconduct analysis.

Nevertheless, the Kansas Supreme Court went on to find that the *Doyle* violation did not constitute plain error requiring reversal under the second step of the prosecutorial misconduct analysis, which requires the court to consider " '(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors.' " *Hunt*, 285 Kan. at 872. In so finding, the court stated:

"We perceive the most harmful evidence was Agent Papish's description of the initial interview with Hunt, in which Hunt said several times that he would talk with the agent the next morning about what happened to his mother. The inference to be drawn from that testimony was that Hunt possessed personal information about the murder. In comparison, the fact that Hunt did not carry through with his promise to talk about the murder is rather harmless. Especially, in light

of Hunt's ultimate answer, 'There was nothing to tell.'" *Hunt*, 285 Kan. at 872-73.

Although in the context of prosecutorial misconduct as opposed to the due process claim asserted in Hunt's K.S.A. 60-1507 motion, the district court here relied on the Supreme Court's finding to similarly hold that Hunt's testimony about his second day of interviews with Papish was a *Doyle* violation but that "this limited error was not so serious as to deprive [Hunt] of a fair trial or to undermine the Court's confidence in the outcome of the case." In support of this holding, the district court found that the State had a strong case against Hunt and that the violation was rather harmless, especially in light of Hunt's ultimate answer that "[t]here was nothing to tell." The district court concluded:

"[I]n light of the evidence, the weight of the evidence against you, in light of the fact that the Supreme Court has indicated that it was relatively harmless, and even without that finding by the Supreme Court, in a week-long jury trial, a lot of witnesses testifying, a lot of pieces of the puzzle, so to speak, to piece together, I don't see that this one comment, that was a *Doyle* violation, undermines my confidence in the jury's verdict. I think, certainly, the jury's verdict should survive this *Doyle* violation."

Hunt claims the district court erred in concluding that the *Doyle* violation was harmless. We disagree.

In *State v. Ward*, 292 Kan. 541, 556-65, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), our Supreme Court clarified the harmless error standard applied to claims of constitutional error. The degree of certainty by which the court must find a constitutional error is harmless beyond a reasonable doubt that there was no impact on the trial's outcome. That means that the error will be declared harmless if this court concludes beyond a reasonable doubt that the error, in light of the whole record, had no reasonable possibility of changing the result of the trial. *Ward*, 292 Kan. 541, Syl. ¶ 6.

Applying this legal standard, the narrow question presented here is whether this court—in light of the record as a whole—can conclude beyond a reasonable doubt that the following question posed by the State and the following response provided by Hunt had no impact on the trial's outcome:

"Q. Did you tell Agent Papish everything you knew?
"A. After I asked for an attorney, he left me.
. . . .
"Q. Did you tell him everything you knew about the murder of your mother Mary Sue Taylor, yes or no?
"A. There was nothing to tell."

Hunt contends that in the absence of the first question and answer, there is at least a reasonable possibility that the outcome of the trial would have been different. In support of this contention, Hunt argues the case against him was circumstantial at best and weighed heavily on the question of whether his strange behavior was due to his guilt or the pressure he felt from his family's accusations. Hunt claims that the case essentially was a credibility contest between himself and his brothers and that the statement he made about requesting an attorney critically damaged his credibility in the eyes of the jury because, to the common juror, an innocent man would not invoke his right to an attorney.

First of all, the fact that the evidence of Hunt's guilt was circumstantial and not overwhelming does not mean the statement he made about requesting an attorney impacted the trial's outcome. Instead, we are required to review the *Doyle* violation in light of the whole record in order to determine whether we can conclude beyond a reasonable doubt that the violation had no impact on the trial's outcome.

The evidence presented in this case established that prior to her death, Mary Sue, Hunt, and Hunt's son lived together in a rental home located in Fort Scott. Mary Sue and Hunt shared the bills and often fought over them. Mary Sue reported to Hunt's brothers and her own brother that Hunt had opened up credit card accounts in her name and made purchases on those cards without her authorization. Although Hunt testified at trial that he did not do so, he thereafter admitted that he fraudulently filled out the credit card applications.

At approximately 7 a.m. on June 20, 2002, Hunt arrived home after working the graveyard shift at his job. That same day, Mary Sue arrived home around 5:30 p.m. Both were alone in the house from that time to approximately 10:45 p.m. During the course of

the day and evening, Hunt called his girlfriend many times, although there were no calls between 2:36 p.m. and 8 p.m.

Near evening on that same day, a witness observed a pickup truck parked in a low-lying area, adjacent to a strip pit situated on the Missouri side of the Missouri-Kansas border. As the witness approached the pickup, he observed a person initially standing next to the passenger door who then entered the pickup on the driver's side. Upon making contact with the pickup driver, the witness observed a motionless person in the passenger seat covered with a blanket or sleeping bag. In answer to the witness' inquiry, the pickup driver said the passenger was his sleeping fiance. Being suspicious about a person covered up with a blanket in hot weather, the witness went to the local sheriff's office to report his concerns.

Hunt ended his work shift around 7 a.m. on Friday, June 21. He cashed his paycheck and drove to Tammy's house in Carterville, Missouri. Hunt arrived at her house that morning with a parcel of his mother's clothes. Tammy thought the gift of clothing was unusual because she and Hunt recently had begun dating, and she barely knew Mary Sue. Hunt also brought a truckload of plastic totes filled with camping equipment and stored the totes in her shed.

Hunt arrived home late in the evening on June 23 to find several members of his family investigating the whereabouts of Mary Sue. No one had seen or heard from Mary Sue after June 20, and she did not report to her scheduled work at the hospital. Right after Hunt learned that his mother was missing, he told Chris, "[I]t will not go to Court." Hunt then told Chris that "if you really wanted to get away with it, you could, if you really wanted to."

Between June 23 when Hunt returned home to find his family searching for his mother and June 29 when the police discovered his mother's body, the family searched for Mary Sue. During this period of searching, Hunt was driving with his brother and sister-in-law near Arcadia where authorities eventually found Mary Sue's body, when Hunt declared that "Terry Taylor [Mary Sue's ex-husband] knows every strip pit from here to West Mineral." Hunt made this remark days before the police found the victim in a nearby strip pit.

On June 28, Hunt visited his friend Frank Ames in Carterville. They purchased some beer at a convenience store. As they were leaving in Hunt's truck, the police initiated a traffic stop, at which time Hunt told Frank, "[M]an, I'm in trouble." Hunt instructed Frank not to tell them who was driving and then jumped out of the truck and ran from the police.

On June 29, the police discovered a body thought to be Mary Sue's wrapped in a blanket and a tarp and floating in a Crawford County strip pit. A few hours after receiving notice that the police found a body in a nearby strip pit, Hunt called Tammy and said, "I love you, I'm leaving." Without telling anyone, Hunt then left his son and family behind and hitched a freight train to Joplin, Missouri. Once in Joplin, Hunt hid in the park and called Tammy to ask her if she could bring him cigarettes and a Dr. Pepper. She did. Hunt then hopped a freight train to Kansas City after which he hopped another freight train heading in the opposite direction, ending up in Emporia.

After authorities confirmed the body was Mary Sue, the police went to Tammy's house and confiscated Hunt's totes. The totes contained an assortment of camping equipment including tarps, tents, lantern mantles, plates, foil, and utensils. The police found rope in one of the totes with a pink and white braided pattern. Testing later revealed that the rope found in Hunt's tote had the same pattern, size, and chemical composition as the rope binding the victim's corpse. The State emphasized the significance of the chemical composition match by showing a different sample that was similar to the rope found in Hunt's tote in terms of look, manufacturer, and lot number, but actually different at the composition level.

In addition to the rope, the police also found masking tape at the home Hunt shared with Mary Sue that had the same chemical composition to the tape binding the victim's body. The tape on her body and the tape from the house had the same width, thickness, chemical composition of the tape backing, and chemical composition of the tape adhesive.

Based on the evidence presented to the jury as set forth above, as well as the fact that the *Doyle* violation was fleeting and confined

to one question and one answer, we conclude beyond a reasonable doubt that the *Doyle* violation had no impact on the trial's outcome.

### 3. *Cumulative Error*

Hunt's final claim on appeal is that even if each of the individual errors committed by his counsel were not ineffective assistance of counsel, the cumulative effect of those errors are sufficient to constitute ineffective assistance. In support of this claim, Hunt points to the State's underwhelming evidence and the Kansas Supreme Court's opinion in Hunt's direct appeal, which noted that "by any measure, the State's evidence in this case was not of a direct and overwhelming nature." *Hunt*, 285 Kan. at 874.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. If the evidence is overwhelming against the defendant, however, no prejudicial error may be found based upon this cumulative error rule. *Thompson v. State*, 293 Kan. 704, 721, 270 P.3d 1089 (2011). However, "[c]umulative error will not be found when the record fails to support the errors raised on appeal by the defendant. [Citations omitted.]" *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). The Kansas Supreme Court has considered cumulative error in an ineffective assistance of counsel claim before. See *Thompson*, 293 Kan. at 721. Thus, it is possible for individual errors of counsel to cumulatively constitute ineffective assistance of counsel.

After the evidentiary hearing, the district court judge addressed Hunt:

"I am the one that heard the trial. I think your attorneys did a fine job in representing you. They left no stone unturned. They presented the best case they could with the facts that then existed.

. . . .

". . . This was a strong circumstantial case against you that the State was able to put together, and I am confident that the outcome of your case is a fair outcome, is a valid outcome, and my confidence, again, in the outcome is not undermined through the actions of your attorney."

We agree that the State had a strong circumstantial case against Hunt. Although the evidence supporting the verdict may not have

been direct or overwhelming, we have considered the totality of circumstances and conclude that Hunt was not substantially prejudiced or denied a fair trial.

Affirmed.