NOT DESIGNATED FOR PUBLICATION

No. 118,539

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MICHAEL R. WILLIAMS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Opinion filed October 12, 2018. Affirmed.

*Roger L. Falk*, of Law Office of Roger L. Falk, P.A., of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., PIERRON and POWELL, JJ.

PER CURIAM: Following the direct appeal of his first-degree premeditated murder conviction, Michael R. Williams filed a motion pursuant to K.S.A. 60-1507, claiming ineffective assistance of counsel. The district court denied his motion after a preliminary hearing. Williams appeals, claiming the district court erred in denying his motion without a full evidentiary hearing and for failing to comply with Kansas Supreme Court Rule 183(j) (2018 Kan. S. Ct. R. 223). Finding no error by the district court, we affirm.

1

In 2012, a jury found Williams guilty of first-degree premeditated murder for shooting and killing his roommate Sean Christopher Putnam in December 2010. The Kansas Supreme Court affirmed his conviction on direct appeal in *State v. Williams*, 303 Kan. 585, 363 P.3d 1101 (2016). The following facts are taken directly from the Supreme Court's opinion.

"In 2010, Williams lived in the same house with Deborah Weiss—who Williams described as his common-law wife—and with Putnam. On the evening of December 21, Williams called the police in an attempt to have Putnam evicted from the home, but the police refused. Later that evening, Williams shot Putnam in the head, killing him. A few days after that, Williams buried Putnam's body in a shallow grave. These facts were undisputed at trial; however, key details were contested.

"*The State's Version of Events*

"The State admitted into evidence a letter written by Troy Walker—Williams' friend—to the mother of Walker's children. In the letter, Walker describes a conversation in which Williams told Walker that he was going to kill Putnam because Putnam had informed Williams' boss that Williams was selling drugs at work. Detective Rick Craig interviewed Walker concerning the conversation described in the letter. According to Walker, Williams was angry at Putnam regarding a job he had received from Williams' employer. Williams was further angered because Putnam had told Williams' boss that Williams was selling 'dope' out of the company truck. Because of this, Walker alleged that Williams said of Putnam, 'I'm going to fuck that dude up' and 'I'm going to kill that pussy.'

"Justin Rose—Williams' neighbor—testified that in early December, Rose had seen a person offer to sell Williams a gun. In mid-December, Williams showed Rose the gun he had purchased and told Rose to keep it quiet because he did not want Putnam to know. Rose testified that at some point after Christmas, Williams came over to his house

and described the shooting. Williams first told Rose, 'I got rid of him.' Rose asked what Williams meant by that, and Williams responded, 'I shot him.'

"Rose did not immediately believe Williams. However, when Putnam's car (which was parked in Rose's driveway) did not move for several days—and especially after Rose observed Williams attempting to sell the car—Rose came to believe that Williams had in fact shot and killed Putnam. Eventually, Rose visited Williams' home and saw the carpet had been removed from Putnam's bedroom and the walls and floor were painted white. Rose noted 'the strongest smell of bleach ever.' At that point, Williams provided Rose with a more complete account of the shooting:

> "'He said that they had gotten into . . . a little argument. And that, I believe he said that [Putnam] was sitting on the edge of his bed. And when he looked down the hallway, . . . he seen [Putnam] flipping him off. And that's when he grabbed the gun and shot him.'

"Williams then told Rose that after he shot Putnam, Putnam 'slunched over at the end of the bed and was making noises. And, at that point, [Weiss] went in there and tied a bungee cord around his neck.' Williams told Rose he had buried Putnam in a tarp with the help of an 'ex-con friend' at a house belonging to that friend's mother.

"Edward Woods—Williams' coworker—testified that Weiss came to his home on the first or second of February 2011 and described the shooting. Weiss told Woods she had seen Williams and Putnam arguing and Williams shot him. She stated the argument was 'over a drug deal.' According to Woods, Weiss said, 'I walked around the corner, and [Williams] come around the corner and shot the guy.' Weiss claimed Putnam and Williams 'had been arguing, or had an argument about something. And it was over, I guess, some type of a drug deal. And that I guess that wasn't the first time that they had been arguing.' Weiss told Woods that after Putnam was shot she became upset and put a cord around his neck. According to Weiss, Putnam was 'gurgling blood' at the time. Weiss told Woods they then wrapped the body in a tarp where it sat in a back room for a few days.

"In addition to the pre-shooting conversation, the Walker letter also described a conversation between Williams and Walker that occurred after the shooting. In the letter, Walker tells his wife how a few weeks after Putnam's death, Walker observed Williams trying to sell Putnam's car to a third party. Walker asked Williams if the car was stolen, and Williams replied that it was not and it would never be reported stolen. Walker inquired further, and Williams said the car would not be reported stolen because Williams had '[s]hot [the owner] in his house and rolled the body up in carpet and got rid of it.'

"Terry Ockert—the man who eventually purchased Putnam's car from Williams—described to Detective Blake Mumma what Williams had told him of the shooting. Ockert claimed he purchased the car from Williams and, at the time, Williams said its previous owner had been killed. Williams told Ockert he had buried the body once and then had to dig it up and rebury it in order to remove a tarp that had been wrapped around the body. According to Ockert, Williams explained that he was '[p]issed off' after the police had refused to evict Putnam on the evening of the killing. Williams indicated he was concerned Putnam was telling the police about crimes Williams 'may or may not have been involved in.'

"Lee Sherard—the man who helped Williams bury Putnam—testified that he had arrived at a friend's house to find Williams and Weiss sitting together, visibly upset. Williams told Sherard that an animal had been killed and they needed help burying it. Sherard testified, 'I treat my animals like my children. So I could see the distraught in both of them. So when he asked if I would help him, I said, Yes, that I would help him bury his dog.' When they arrived at Williams' home, Sherard saw a large body covered with a tarp and he recognized what he believed to be a human foot sticking out from under the tarp.

"At that point, Williams told Sherard that he had 'shot a friend.' Sherard helped Williams load Putnam's body into the back of Williams' truck, and they left to search for a burial site. After hours of unsuccessful searching, Sherard told Williams they could bury the body behind Sherard's mother's house. Sherard testified he assisted Williams because he was afraid and did not actually want Putnam's body buried behind his mother's house. When they arrived, Sherard went inside and left Williams to bury the body alone. The next day, Sherard observed part of the blue tarp protruding from the

4

ground. He later confronted Williams with this fact. Putnam's body was eventually discovered behind Sherard's mother's house. It was buried approximately 7 inches deep and was no longer wrapped in a blue tarp.

"Finally, Dr. Jaime Oeberst—the Sedgwick County district coroner—testified that Putnam's autopsy showed he had been shot in the head and had bruising to his neck. The bruising was consistent with injuries inflicted while Putnam was still alive. The gunshot wound entered through the left side of his forehead and exited the back of his scalp on the right. Putnam's blood was found in the cracks between the floorboards in Putnam's bedroom.

"*Williams' Version of Events*

"In his defense at trial, Williams presented a very different version of the events culminating in Putnam's death. Williams testified that after the police left without evicting Putnam, Williams drove around for an hour or two and then went to Rose's house. Williams attempted to sell his gun to Rose in order to get money for a hotel room, but Rose refused to buy it. Later that evening, Williams returned home and fell asleep with the gun in his easy chair in the living room.

"Williams testified he woke at around 11 p.m. to the sound of Weiss and Putnam screaming. Williams said he got up and saw Putnam holding Weiss by the hair. According to Williams, Weiss was naked and 'I pulled the gun from my [waist] and I tell him to let go. He didn't pay no attention to me, he's holding her, he's looking at her and he's screaming at her and he's not listening to me. And I fired a shot at him.' Williams then described how Putnam fell backwards into his bedroom.

"On cross-examination, Williams said that before the shooting, 'I tried pulling on her. I can't get her loose.' Williams described, 'He won't let go. He's pulling her back. I pulled the gun out. I point it at him and say, Let go. And with the other hand, I'm trying to pull on her. About the time he lets go, I fire.' Williams then acknowledged he must have let go of Weiss long enough to pull the slide back on the gun in order to chamber a round before he pointed the gun at Putnam.

"After the shooting, Williams 'checked my wife out. She's naked. I asked her why she's standing there naked, what the Hell happened?' Williams testified Weiss told him that she had taken a shower and forgotten a towel. When she came out of the bathroom, Putnam 'had said something to her. And she had said something back or something. Then they had an argument. And that's why he grabbed her.' Williams testified that at the moment he saw Putnam holding Weiss' hair, 'I don't know what I thought, but I was scared. I was angry probably. I was probably—I don't know, I couldn't tell you exactly what went through my mind, you know. I just acted.' Williams explained, 'I thought he was going to hurt her. He told me how he was trained. He's told me how he's killed people. He's showed me pictures of being in the SWAT.'

"After assuring himself that Weiss was unhurt, Williams claimed he went to Rose's house for help but Rose was not home. When he returned, a bag was over Putnam's head. Weiss told him the bag was necessary to contain all of the blood. Williams took trash bags and bagged up everything with blood on it. He then stripped Putnam's body and wrapped it in a blue tarp. Putnam's body remained in the house for the next 2 days while Williams tried to decide how to dispose of it. Just before Christmas, Williams and Weiss were at a friend's house when they met Sherard, the man who would lead them to the spot where Williams buried Putnam's body.

"Williams' entire defense strategy was pegged to his claim that when he shot Putnam, he had acted in defense of another—namely, Weiss. In support of this theory, Williams hoped to show the jury that Putnam was known to Williams as a fearsome killer with a short temper and a substantial history of violence against women. From Williams' perspective, two important pieces of this evidentiary puzzle were claims made by two different women that Putnam had either raped or attempted to rape them." 303 Kan. at 586-91.

On direct appeal, Williams argued the district court erred in ruling the evidence of Putnam's sexually violent acts against the two women was inadmissible under K.S.A. 60-447. Our Supreme Court held that the district court was right for excluding the evidence but for the wrong reasons. Specifically, the Supreme Court held that the district court correctly ruled the evidence inadmissible because Williams presented no evidence he was

aware of Putnam's violent acts against the two women when he shot Putnam; thus, the evidence was not relevant to show Williams' state of mind during the shooting. 303 Kan. at 595. Following a review of his other claims, our Supreme Court affirmed Williams' conviction. 303 Kan. at 604.

In October 2016, Williams filed his pro se K.S.A. 60-1507 motion that argued his trial and appellate attorneys provided ineffective assistance of counsel. After appointing Williams counsel and holding a hearing with only counsel present, the district court denied Williams' motion in a minute sheet that adopted the State's response to Williams' pro se motion as its factual findings and legal conclusions. The district court also made independent findings that, based on the record, an improved defense of another would not have resulted in a different outcome.

Williams timely appeals.

I.    DID THE DISTRICT COURT ERR IN DENYING WILLIAMS' K.S.A. 60-1507 MOTION WITHOUT CONDUCTING AN EVIDENTIARY HEARING?

Williams argues the district court erred in denying his K.S.A. 60-1507 motion without conducting a full evidentiary hearing and for failing to address one of his claims in violation of Rule 183(j).

A district court has three options when reviewing a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented

7

requiring a full hearing.' *Fischer v. State*, 296 Kan. 808, 822-23, 295 P.3d 560 (2013)."
*Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

The parties dispute which standard applies. Williams argues we should conduct a de novo review, while the State argues that we should review the district court's factual findings for substantial competent evidence and the legal conclusions de novo. The district court appointed Williams counsel and conducted a preliminary hearing without Williams' presence but where each counsel presented argument. After the preliminary hearing, the district court denied Williams' K.S.A. 60-1507 motion in a minutes sheet that adopted the State's response to Williams' motion as its factual findings and legal conclusions. The district court also found—outside of the State's response—that based on the record an improved defense of another would not have changed the outcome of the trial.

Our review of a district court's denial of a K.S.A. 60-1507 motion depends on which option the district court applied. "When, as here, a court denies a 60-1507 motion based only on the motion, files, and records after a preliminary hearing, we are in as good a position as that court to consider the merits." 300 Kan. at 881. Therefore, our review is de novo.

A.    *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution, made applicable to the states under the Fourteenth Amendment, guarantees a defendant the right to effective assistance of counsel. 300 Kan. at 882.

"Claims of ineffective assistance of counsel for deficient performance under the
first category are the 'general rule' and controlled by *Strickland.* To prevail on such a
claim, a criminal defendant must establish (1) the performance of defense counsel was
deficient under the totality of the circumstances, and (2) prejudice, *i.e.,* that there is a

8

reasonable probability the jury would have reached a different result absent the deficient performance. [Citations omitted.]" 300 Kan. at 882.

Our Supreme Court has explained:

"'The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and . . . [w]e must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'

"'[Under the second prong of the test for ineffective assistance of counsel], the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citations omitted.]'" *State v. Butler*, 307 Kan. 831, 852-53, 416 P.3d 116 (2018).

"'A movant has the burden to prove his or her K.S.A. 60-1507 motion warrants an evidentiary hearing; the movant must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record.' [Citation omitted.]" *Sola-Morales*, 300 Kan. at 881. Although pro se pleadings are to be liberally construed, "a pro se movant still bears the burden to allege facts sufficient to warrant a hearing on the motion, and 'mere conclusions of the defendant or movant are not sufficient to raise a substantial issue of fact when no factual basis is alleged or appears from the record.' [Citations omitted.]" *Mundy v. State*, 307 Kan. 280, 304, 408 P.3d 965 (2018).

Williams argues that his counsel, Steven D. Mank, performed deficiently at trial and deprived him of a fair trial because Mank failed to (1) object to hearsay statements;

9

(2) proffer evidence and prepare Williams to testify that he knew when he shot Putnam that Putnam had committed sexually violent acts against two women; (3) call Weiss to testify; and (4) investigate Williams' mental state before trial and obtain an expert witness to testify regarding a mental state defense. Williams also argues Mank's four instances of deficient performance cumulatively denied him of a fair trial. In his final claim on appeal, Williams argues we must remand because the district court completely failed to address his conflict of interest claim in violation of Rule 183(j).

1.      *Failure to object to hearsay testimony*

Williams first argues that Mank's failure to object to Ockert's hearsay statements during Detective Mumma's testimony deprived him of a fair trial. Our Supreme Court summarized the hearsay statements as:

> "Ockert claimed he purchased the car from Williams and, at the time, Williams said its previous owner had been killed. Williams told Ockert he had buried the body once and then had to dig it up and rebury it in order to remove a tarp that had been wrapped around the body. According to Ockert, Williams explained that he was '[p]issed off' after the police had refused to evict Putnam on the evening of the killing. Williams indicated he was concerned Putnam was telling the police about crimes Williams 'may or may not have been involved in.'" *Williams*, 303 Kan. at 588.

In addition, Mumma testified Williams told Ockert that he believed Putnam was telling the police that he was messing or using drugs with a teenage girl.

The district court held, in part, that Williams failed to establish Mank's failure to object to the hearsay statements fell below the applicable standard of care. The record shows the State afforded Mank the opportunity to object, and Mank stated, in a conference outside the jury's presence, that he (1) did not oppose the admission of the hearsay evidence; (2) was aware that Ockert was subject to subpoena and in custody; and

10

(3) planned to cross-examine Mumma. On appeal, Williams offers only a brief, conclusory argument that Mank's failure to object to the hearsay statements violated his constitutional right of confrontation and was unreasonable. We conclude that Williams fails to show Mank's decision was unreasonable under the totality of the circumstances.

Nevertheless, Williams' principal argument on appeal is that Mank's failure to object to the hearsay evidence changed the outcome of the trial. But even if we were to assume that Mank's performance was deficient, Williams does not meet his burden to establish constitutional prejudice, "*i.e.*, [that] a reasonable probability exists the trial outcome would have been different." *State v. Johnson*, 304 Kan. 924, 954, 376 P.3d 70 (2016). As the State argues, Williams only briefly mentions that Mank's failure to object to the hearsay statements during Mumma's testimony would have negated proof of his premeditation and changed the outcome. As a result, his claim lacks merit because "the movant must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record.' [Citation omitted.]" *Solas-Morales*, 300 Kan. at 881.

Even without Ockert's hearsay statements—we pause to note that under K.S.A. 60-460(a) Ockert's statements to Mumma fall under an exception to the hearsay rule because Ockert was available to testify and under subpoena—the State admitted evidence at trial similar to the hearsay statements. Ockert's statements established Williams was upset before shooting Putnam because the police did not evict Putnam earlier that night and Williams believed Putnam may have told the police he was "messing" or using drugs with a teenage girl. Testimony from Rose and from the officer who responded to Williams' 911 call also established Williams argued with Putnam and called the police, and the police did not make Putnam leave. Rose testified Williams told him that night, before the shooting, he wanted Putnam to move out. Additionally, the State presented evidence that the deterioration of Williams' and Putnam's relationship may have related to a drug deal.

11

The State also presented overwhelming evidence to support Williams' guilt and that he acted with premeditation.

> "'Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.' Several factors may give rise to an inference of premeditation, including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. Moreover, premeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is a reasonable one. [Citations omitted.]" *State v. Morton*, 283 Kan. 464, 474-75, 153 P.3d 532 (2007).

Rose testified Williams bought a gun before the shooting and did not want Putnam to know. Additionally, Rose testified Williams had described shooting Putnam after an argument where Putnam flipped off Williams, when Putnam was sitting on the edge of his bed and Williams was in the hallway. Walker's letter—although not included in the record on appeal but summarized by our Supreme Court—established that Williams told Walker that he was going to kill Putnam because Putnam had informed Williams' boss that Williams was selling drugs at work. In addition, Woods testified that Weiss later stated the argument between Putnam and Williams regarded a drug deal and it was not the first time the two had argued. The State presented evidence Williams was present when Weiss put a bungee cord around Putnam's neck while he was still alive after Williams shot Putnam. Rose testified Williams stated—after the shooting—that he got rid of Putnam, and the State presented a multitude of evidence that Williams took numerous steps to cover up Putnam's death which, at the least, lends inferential support he acted with premeditation.

12

Therefore, even if Mank somehow performed deficiently in failing to object to the hearsay statements, the State presented overwhelming evidence that supported Williams' guilt. Consequently, Williams cannot establish prejudice, and the district court did not err in denying Williams' claim.

2.    *Failure to proffer adequate evidence and prepare Williams to testify*

Williams argues Mank was deficient in failing to adequately proffer his state of mind evidence before trial, i.e., that he knew at the time he shot Putnam that Putnam had raped C.D. and had attempted to rape M.M. Williams also argues Mank failed to prepare him for trial.

In his direct appeal, Williams argued that the district court erred in ruling M.M.'s proffered testimony—that Putnam had attempted to rape her—inadmissible. The Supreme Court summarized Williams' defense theory as follows:

> "The first, M.M., was a mutual friend of Williams and Putnam. At trial, M.M. proffered the following testimony. On December 16, 2010, M.M. claimed that Williams and Putnam had thrown her a birthday party at their home. At one point during the party, M.M. noted that Williams had gone outside and she decided to take a piece of birthday cake to Putnam's room, where he was lying down either depressed or 'dope sick.' Then, according to M.M.:
>
>> "'[Putnam] gets out of bed. And I'm looking at him, and he just kind of slams me down on the bed and holds me down. And I didn't know. It just caught me off guard, by surprise. And he starts undoing my shirt and pulled my shirt off. And he gets down to my jeans and starts pulling my jeans off. And the front door opens, and it's [Williams], and he's hollering, Hey. And [Putnam] jumps up and he says, Don't say a word about this. I mean, I was in total ow [sic] because he just went from nice

13

and kind of depressed to a complete rage. And it just scared me. I mean, this is all like in a matter of seconds. I didn't know what to say.'

"The district court, however, disallowed the presentation of this evidence to the jury, reasoning that it was evidence of prior specific instances of conduct inadmissible pursuant to K.S.A. 60-447. M.M. was permitted to testify that in her opinion Putnam had a tendency towards violence and 'was a good guy until he didn't get what he wanted. I mean, he went from nice to violent.' She also stated that Putnam 'went from a nice guy to a violent and rape guy.'

"The second woman, C.D., had alleged that sometime in the past, Putnam had raped her. However, C.D. was unable to provide any testimony—proffered or otherwise—because Williams and his defense team could not find her. Unbeknownst to them, C.D. was in fact in custody on a material witness warrant in an unrelated case. When Williams discovered that this is where C.D. had been during his trial, he moved for a new trial, alleging that the State had committed a *Brady* violation by withholding from Williams' defense lawyers information about C.D.'s allegations against Putnam and information about her whereabouts. The district court denied the motion on the grounds that the evidence would not have had any impact on the trial because it would have been inadmissible for the same reason that M.M.'s specific allegation against Putnam was inadmissible." 303 Kan. at 591-92.

As discussed above, our Supreme Court held the district court was right for the wrong reasons in ruling M.M.'s testimony inadmissible: "While the district court's ruling—hinged as it was exclusively on an application of K.S.A. 60-447—was incomplete, the district court reached the correct result because the excluded evidence was not probative of the material fact of Williams' state of mind at the time of the killing." 303 Kan. at 595. The Supreme Court explained the evidence was not relevant under *State v. Walters*, 284 Kan. 1, 159 P.3d 174 (2007), because

"unlike *Walters*, the facts of this case demonstrate that the excluded evidence was not relevant to show Williams' state of mind at the time he shot Putnam. The record is

14

entirely devoid of any evidence that Williams had any knowledge—at the time Putnam was killed—of the specific allegations against Putnam made by M.M.

"Without at least some evidence tending to establish that Williams was aware of the allegations made by M.M., those allegations cannot be relevant to the disputed fact of Williams' state of mind at the time Putnam was shot. Even circumstantial evidence from which a reasonable juror could infer that Williams possessed knowledge of the allegations would be sufficient. The record here, however, is not amenable to such an inference.

. . . .

"Put simply, the record lacks any evidence establishing a nexus between the alleged prior bad act of the victim—Putnam in this case—and the defendant's state of mind at the time the defendant claims to have acted in self-defense or defense of another. In these circumstances, the prior bad act of the victim is not relevant to a material fact and is not admissible under the rule established in *Walters*.

. . . .

". . . Clearly Williams became aware of C.D.'s and M.M.'s statements at some point, but nothing in the record indicates he was aware of them at the time of the shooting. Williams had ample opportunity to lay that foundation, but he did not— presumably because the truth in this regard would have foreclosed his ability to even argue that the women's allegations against Putnam should be heard by the jury." 303 Kan. at 594-95, 598.

In adopting the State's response to Williams' pro se K.S.A. 60-1507 motion, the district court denied Williams' claim because he did not demonstrate that Mank's failure to proffer his state of mind evidence caused prejudice. The district court held that the probable cause affidavit—which is not included in the record on appeal—and Williams' and Weiss' contrary statements before trial establish that an improved defense of another would not have resulted in a different outcome at trial.

15

First, Mank was not deficient in directing Williams not to testify about M.M.'s allegations against Putnam. Mank was ensuring Williams complied with the district court's order—issued before Williams' testimony—excluding evidence of Putnam's attempted rape against M.M. Therefore, the district court did not err in summarily denying Williams' claim Mank erred in telling him not to testify about his awareness of Putnam's attempted sexual assault against M.M. when he shot Putnam.

Second, Williams briefly argues he was prejudiced by Mank's failure to prepare him to testify at trial and for failing to make an adequate proffer of his state of mind evidence. Williams argues Mank should have conducted a mock examination before trial to help Williams testify about his awareness of Putnam's alleged prior violence when he shot Putnam. But Williams fails to demonstrate that but for Mank's deficient performance in failing to proffer and present his state of mind evidence there is a reasonable probability the result of his trial would have been different. See *Sola-Morales*, 300 Kan. at 882.

Likewise, a review of all the evidence establishes that Williams cannot demonstrate Mank's presumed deficient performance prejudiced him; even if the jury had considered Putnam's prior sexually violent acts against C.D. and M.M., there is not a reasonable probability that Williams' defense of another would have succeeded. While the additional evidence may have helped Williams present his defense of another theory, the State presented overwhelming evidence showing Williams shot Putnam with premeditation and an intent to kill. The jury heard Williams describe his state of mind when he shot Putnam. Williams testified that he did not really think but just acted, he was scared and probably angry, and he believed Putnam was going to hurt Weiss because Putnam had told Williams he killed three people while working in law enforcement. Williams described the event as about six to eight seconds in length between when he woke up from a dead sleep, ran to the hallway, struggled with Putnam over Weiss, told Putnam to let go of Weiss, loaded a shell into the gun, and shot Putnam. The jury

16

convicted Williams of first-degree premeditated murder despite hearing Williams' testimony.

The district court did not err in summarily denying Williams' ineffective assistance of counsel claim regarding a defense of another.

3. *Failure to call Weiss to testify*

While Williams acknowledges on appeal that Mank's decision not to call Weiss to testify involves trial strategy, he nevertheless argues that Mank's decision was uninformed and based on an insufficient investigation. It is well established that

> "'decisions on what witnesses to call, whether and how to conduct cross-examination, . . . and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client.' "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" And [the] defendant bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy. [Citations omitted.]" *Johnson*, 304 Kan. at 951-52.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *State v. Hedges*, 269 Kan. 895, 914, 8 P.3d 1259 (2000).

Specifically, Williams argues Mank's decision was uninformed because it was based only on the prosecutor's statement that Weiss had some fanciful story about a knife being involved and that she could not be trusted. Assuming Williams' assertion is true, his counsel's decision arguably does not amount to ineffective assistance of counsel. Williams concedes Mank interviewed Weiss, planned to call her as a witness before trial,

17

and had her under subpoena. Notably, Williams does not argue that Mank conducted an inadequate interview of Weiss.

In his pro se motion, Williams argued that had Mank called Weiss to testify, she could have contradicted Woods' testimony, presented evidence bolstering Williams' claim that Putnam had attempted to rape M.M., and supported his theory of defense. Williams attached to his pro se motion Weiss' affidavit supporting the above legal claims with her factual assertions.

But Williams fails to establish whether Mank had or lacked the above factual and legal information regarding Weiss' testimony when he chose not to call her at trial. Thus, as the State argues, Williams does not establish what law or facts Mank failed to uncover when he chose not to call Weiss as a witness. Williams offers only a conclusory statement that Mank decided not to call Weiss as a witness because he did not investigate the truth of the prosecutor's statements. Moreover, the record discloses no evidence that the altercation leading up to Putnam's shooting involved a knife, and Mank's decision not to call Weiss arguably may have constituted trial strategy. Given our highly deferential review of a trial counsel's performance, "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *State v. Schaefer*, 305 Kan. 581, 596, 385 P.3d 918 (2016).

The record contains some evidence that may explain why Mank chose not to call Weiss as a witness. The State charged Weiss with one count of first-degree premeditated murder as Williams' codefendant in the killing of Putnam. After the joint preliminary hearing, the district court held probable cause supported the charge against Weiss and Williams. Before trial, Williams moved to sever the trials, arguing a severance would prevent prejudice because the State could admit Weiss' damaging prior statements against

18

her at a joint trial that were inadmissible against him and Weiss could use an antagonistic defense that placed all the blame on Williams. The district court granted his unopposed motion. Thus, the record could support the rationale that Mank may have considered not calling Weiss as a witness because her testimony would have negatively impacted Williams' defense. However, because the district court summarily denied the motion, the record does not contain Mank's account detailing why he did not call Weiss to testify.

Based on our review of the record, we find Williams has failed to show how Mank's decision not to call Weiss was not a strategic decision.

Williams also fails to demonstrate how Mank's decision not to call Weiss to testify caused constitutional prejudice. Williams presented no argument below or on appeal that but for Mank's failure to call Weiss as a witness, there was a reasonable probability that the jury's verdict would have been different. See *Butler*, 307 Kan. at 852-53. The district court denied Williams' claim, in part, for a failure to set forth more than a conclusory argument that Mank's decision caused prejudice, and Williams does not challenge the district court's decision on appeal. Williams only argues on appeal that Mank's decision fell below the applicable standard of care; in other words, he only appeals the first prong of the ineffective assistance of counsel claim. Because a movant must establish both prongs to succeed on an ineffective assistance of counsel claim, Williams' failure to argue and establish prejudice defeats his claim. See *State v. Anderson*, 291 Kan. 849, 858, 249 P.3d 425 (2011) ("An issue not briefed or raised incidentally but not argued is deemed abandoned.").

But even a review of the merits of whether Mank's failure to call Weiss prejudiced Williams does not show a reasonable probability that Weiss' testimony would have caused a different outcome. As stated above, Williams argued Weiss would have contradicted Woods' testimony, presented evidence bolstering Williams' claim that Putnam attempted to rape M.M., and supported his theory of defense. Assuming Mank

19

performed deficiently in failing to call Weiss to testify, the record fails to establish a reasonable probability that Weiss' testimony would have changed the outcome of the trial.

In the affidavit attached to Williams' motion, Weiss affirmed she was in a sexual relationship with Woods throughout 2010. Williams argues Mank could have used that fact to impeach and undermine Woods' credibility. But Weiss' impeachment evidence would likely have had a low impact on Woods' credibility. During Woods' testimony, counsel had to refresh his memory several times because he could not recall his prior statements. Additionally, Woods' testimony mostly involved Weiss' statements to Woods on the day he took Weiss to turn herself into the police. Moreover, the State had admitted evidence via Walker's letter that the argument between Williams and Putnam may have involved a drug deal. Finally, Williams does not establish how Weiss would address her prior inconsistent statements to Woods that contradicted his defense of another theory or how Weiss would address the fact that she also was charged with first-degree premeditated murder as a codefendant. Accordingly, using Weiss' sexual relationship to impeach Woods likely would not have impacted Woods' credibility or undermined confidence in the outcome of the trial.

The State also presented a multitude of evidence supporting Williams' guilt, and Weiss' corroborating testimony does not undermine our confidence in the outcome of the trial. The State presented evidence that Williams acted with premeditation and with an intent to kill before he shot and killed Putnam: Williams told Rose not to tell Putnam he bought a gun; the night of the shooting Williams told Rose he wanted Putnam to move; Williams told Walker he was going to kill Putnam because Putnam told Williams' boss he had sold drugs out of his company car; Weiss told Woods that the argument between Williams and Putnam was about a drug deal and it was not the first argument; Williams told Ockert that he was pissed off because the police did not evict Putnam and he thought Putnam told the police that he was "messing" or using drugs with a teenage girl. The

State also presented evidence of premeditation based on Williams' statements after he shot Putnam and the numerous steps he took to cover up Putnam's death. Because overwhelming evidence supports Williams' guilt, Weiss' testimony that Williams believed he needed to shoot Putnam to defend Weiss from rape would not have changed the outcome of the trial.

Williams therefore cannot establish any prejudice due to Mank's failure to call Weiss as a defense witness, and the district court did not err in summarily denying this claim.

4.      *Failure to investigate Williams' mental state and obtain an expert witness*

Williams argues that the district court erred in summarily denying his claim that Mank was ineffective in not investigating his mental state before trial and for failing to hire an expert witness to pursue a mental state defense at trial.

In 2010, K.S.A. 22-3220 defined the mental state defense as "a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged." Two panels of this court have held the decision to pursue a mental state defense, also referred to as a mental disease or defect defense, remains with the defendant and is not a strategic decision that lies with his or her counsel. See *Buehler-May v. State*, No. 108,990, 2014 WL 1302612, at *5 (Kan. App. 2014) (unpublished opinion); *Ellmaker v. State*, No. 108,728, 2014 WL 3843076, at *15 (Kan. App. 2014) (unpublished opinion).

Williams attached documents to his pro se motion which establish that he went through a traumatic event earlier in life. He discovered his brutally beaten father after a robbery at his father's home in 1998. Based on this traumatic event and his belief that Putnam had committed violent acts against others, Williams argues Mank was deficient

21

in failing to investigate and hire an expert witness to present a mental state defense that he may have possibly shot Putnam while suffering under an episode of posttraumatic stress disorder (PTSD).

However, Williams fails to establish an evidentiary basis in the record to support his claim that Mank performed objectively unreasonably in not investigating Williams' mental state, for not having Williams obtain a mental health evaluation, and for not obtaining an expert witness to testify in support of a mental state defense at trial. Williams' postconviction counsel concedes, and a review of the record confirms, that the record contains no evidence that Williams requested a mental health evaluation before trial. Moreover, Williams does not establish that Mank knew before trial about his prior traumatic experience and that he might suffer from PTSD.

Nevertheless, Williams argues that Mank was deficient in failing to investigate a mental state defense because Williams showed remorse and suffered major depression after shooting Putnam. But Mank's awareness of his resulting mental health conditions from shooting and killing Putnam does not support a finding that Mank acted unreasonably before trial. As stated above, Williams does not establish that Mank had knowledge of (1) Williams' prior traumatic experience, (2) Williams suffering from PTSD, or (3) Williams having or thinking that he had a mental health condition that could render him incapable of forming the requisite mental state to commit first-degree premeditated murder. Thus, Williams fails to establish and the record contains no evidentiary basis to support Williams' claim that Mank's failure to investigate a mental state defense was unreasonable.

The above analysis notwithstanding, and even assuming Williams asserted prejudice, he cannot demonstrate that but for his counsel's failure to present a mental state defense, there is a reasonable probability his mental state defense would have succeeded. See *Butler*, 307 Kan. 853. The State presented overwhelming evidence supporting the

22

verdict, i.e., Williams acted with premeditation and an intent to kill Putnam. Williams does not establish his counsel's failure to pursue a mental state defense was unreasonable and prejudiced him; therefore, the district court did not err in summarily denying his claim.

5. *Cumulative Error*

Williams argued below that the totality of Mank's alleged ineffectiveness denied him the right to a fair trial. "[I]t is possible for individual errors of counsel to cumulatively constitute ineffective assistance of counsel." See *Hunt v. State*, 48 Kan. App. 2d 1023, 1046, 301 P.3d 755, *rev. denied* 298 Kan. 1202 (2013).

> "'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citations omitted.]" *Thompson v. State*, 293 Kan. 704, 721, 270 P.3d 1089 (2011).

We have consistently found that the evidence against Williams was overwhelmingly in support of his guilt. Additionally, the record here fails to support the errors Williams has raised on appeal. See *Hunt*, 48 Kan. App. 2d at 1046. Given our conclusion that none of Williams' alleged deficient performance claims amount to ineffectiveness, we find no cumulative error.

6. *Conflict-free Counsel*

Williams' final argument is that the district court erred by completely failing to address his conflict of interest claim contrary to Rule 183(j) and that its failure to do so requires a remand for an evidentiary hearing. In response, the State argues a remand is

not necessary because the district court addressed and properly denied Williams' claim. The graveman of Williams' argument on appeal is that Mank provided ineffective assistance of counsel because Mank had a financial conflict of interest.

"Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984). Moreover,

> "'The right to counsel extends a duty of loyalty from counsel to the client so "[a] defendant in a criminal trial must have 'representation that is free from conflicts of interest.' [Citations omitted.]" To prevail on such a claim, the defendant must first establish his or her attorney "actively represented conflicting interests." Beyond this starting point, the type of alleged conflict dictates what the defendant must additionally establish to prevail. The United States Supreme Court has recognized three subcategories of conflict of interest claims: (1) the automatic reversal exception, (2) the adverse effect exception, and (3) what we have labeled the "*Mickens* reservation." See 296 Kan. at 181-85 (discussing the three *Mickens* subcategories).' [Citations omitted.]" *State v. Fuller*, 303 Kan. 478, 487, 363 P.3d 373 (2015).

Our Supreme Court has further summarized that

> "[i]n the first subcategory of such claims, which involve multiple concurrent representations of codefendants with antagonistic interests, reversal is automatic. In the second subcategory, also involving certain instances of concurrent representation, it is sufficient if a defendant shows an adverse effect on the adequacy of counsel's performance. In the third subcategory, involving a conflict between the defendant and a former client or between the defendant and the attorney, no standard of prejudice or adverse effect has previously been established by the United States Supreme Court." 303 Kan. 478, Syl. ¶ 1.

24

The third subcategory includes conflicts of interest involving "'counsel's personal or financial interests.' [Citations omitted.]" 303 Kan. at 487.

Williams' argument in support of a remand for an evidentiary hearing mainly relies on Rule 183(j), which requires a district court to make factual findings and conclusions of law on all issues when it holds a preliminary hearing on a K.S.A. 60-1507 motion. See *State v. Wilson*, 308 Kan. 516, 527, 421 P.3d 742 (2018); *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007). "[T]he 'fundamental problem' with a district court's failure to abide by Rule 183(j) is that it 'impedes appellate review.'" *Wilson*, 308 Kan. at 527.

The problem with Williams' argument is that he did not object to the district court's alleged inadequate findings; therefore, we may presume the district court found all the facts necessary to support its judgment. See *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). Here, the district court issued a minute sheet adopting the State's response to Williams' pro se K.S.A. 60-1507 motion as its factual findings and legal conclusions. The State's response, for the most part, provided adequate factual findings and legal conclusions on each of Williams' claims, and contrary to Williams' argument on appeal, the district court did not completely fail to address his conflict of interest claim. Instead, the district court denied the claim based on the record, holding Williams' argument was conclusory and failed to provide an evidentiary basis to show Mank acted disloyally and as a mere friend of the court.

Williams' allegation is that Mank told him before trial that his firm usually charged $45,000 to $50,000 to defend a murder case and, "Mike your [sic] only getting a $20,000 defense. There's no me and you but nor is there me and the prosecution." According to Williams, Mank also offered Williams $250 to take a plea and marry Weiss. On their face, Williams' allegations strain credulity, particularly given Mank's many years of practice, but our review requires us to accept them as true.

"'An actual conflict of interest exists if "the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." [Citation omitted.]'" *State v. Cheatham*, 296 Kan. 417, 452, 292 P.3d 318 (2013). A fee agreement may also create a conflict of interest if the defendant's "'interests in effective representation [are] pitted against trial counsel's monetary interest.' [Citation omitted.]" 296 Kan. at 452.

Williams offers only a conclusory argument that Mank's lower than usual fee resulted in Mank's deficient performance. Williams simply makes the bare allegation that Mank's deficient performance constitutes proof that Mank did not actively advocate on his behalf at trial, claiming Mank's conflict of interest is shown through Mank's failure to (1) investigate his state of mind and hire an expert witness; (2) prepare Williams for trial and argue against the State's motion in limine; (3) consult with Williams and call Weiss as a witness; and (4) consult with Williams on how to present his theory of defense. Additionally, Williams argues that Mank acted as a mere friend of the court.

Counsel acts as a "mere friend of the court" when the attorney fails to actively advocate on behalf of his or her client or fails to function as an adversary to the State. See *Fisher v. Gibson*, 282 F.3d 1283, 1304 (10th Cir. 2002); see also *United States v. Cronic*, 466 U.S. 648, 656-57, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) ("[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."). A review of the trial transcript, however, confirms that Mank did not act as a mere friend of the court; he actively cross-examined the State's witnesses and throughout the trial and closing pursued Williams' defense theory and attacked the State's theory. Given our previous findings that Mank's performance was not deficient, we see no merit to Williams' claim of alleged deficient performance based upon a conflict of interest.

Affirmed.

26