NOT DESIGNATED FOR PUBLICATION

No. 118,590

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DONNELL ALAN DOBBS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed December 7, 2018. Affirmed.

*Carl E. Cornwell*, of Olathe, for appellant.

*Ethan Zipf-Sigler*, assistant district attorney, *Marc A. Dupree Sr.*, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., PIERRON and LEBEN, JJ.

PER CURIAM: A jury convicted Donnell Alan Dobbs of first-degree murder, attempted first-degree murder, and criminal possession of a firearm. The Kansas Supreme Court affirmed his convictions on direct appeal. *State v. Dobbs*, 297 Kan. 1225, 308 P.3d 1258 (2013). Dobbs then filed a K.S.A. 2017 Supp. 60-1507 motion, arguing his court-appointed attorney, Michael Highland, had been ineffective at trial. After an evidentiary hearing, the district court denied the motion. Dobbs appeals. Finding no error, we affirm.

While we recognize that Dobbs challenges his convictions, we begin with the facts as found by a jury in the trial at which Dobbs was convicted. On October 3, 2008,

1

between 4:10 p.m. and 4:30 p.m., Dobbs walked into TJ's Barbershop with an assault rifle and opened fire. TJ's Barbershop was located at the intersection of 13th Street and Washington Boulevard. Three men inside the barbershop ran out the front door and into a nearby wooded area. Dobbs pursued two other men, Muryel Josenberger and Mario Mitchell, out the back door.

"Dobbs shot both men, killing Josenberger and severely wounding Mitchell, then left the scene in a gray or silver Monte Carlo driven by a second man. Mitchell told the first police officer who arrived after the shooting that two unknown black men walked into the shop and began shooting. Mitchell was transported to Truman Medical Center where he was treated for 12 gunshot wounds and remained for about 1 month.

"Twelve days after the shooting, Mitchell identified Dobbs as the gunman and Casey Ellis as the driver of the getaway car. Two days later, the State filed a joint complaint charging Dobbs and Ellis with first-degree premeditated murder and attempted first-degree premeditated murder and additionally charging Dobbs with criminal possession of a firearm. The following facts were developed at Dobbs and Ellis' joint trial.

"The barbershop's owner, Anthony Jackson, testified that on the day of the shooting, he was facing the back of the shop when he heard Mitchell say, "[O]h shit," and saw him run toward the back door. Jackson turned around and saw a man with an assault rifle come through the front door and move toward the back of the shop. Another barber at the shop, Damon Campbell, also saw a man walk into the shop with a 'long gun.'

"Jackson and Campbell testified they ran out the front door of the shop and into a nearby wooded area as the gunman moved toward the back of the shop and began shooting. At some point, Jackson heard the sounds of screeching tires and a fast-moving vehicle. When Jackson and Campbell returned to the shop, they could see that Josenberger and Mitchell had been shot and were lying on the ground outside the back door.

"Jackson and Campbell both testified the gunman wore a hat and had a bandana or scarf over his face covering the area under the gunman's eyes. Jackson did not recall the color of the hat or scarf, but Campbell testified they were both blue. Sometime after the shooting, Jackson and Campbell each viewed several photographs of potential suspects, but neither man could identify the gunman.

2

"Diana Union testified she was driving toward the intersection of 13th Street and Washington Boulevard when she saw two men running into a wooded area to the west of TJ's Barbershop. As Union approached the barbershop parking lot, a gray Monte Carlo exiting the parking lot nearly collided with Union's vehicle. Union could see a man holding a gun out the passenger-side window. Union described the gun as black with 'holes in it around the barrel part of it ... [t]he way machine guns look.' Union stopped at a nearby friend's home where her friend called 911 and reported the incident.

"Bobbie Montiel testified she was in her front yard near 14th Street and Washington Boulevard when she heard screaming and gunshots. Montiel grabbed her children and ran to the side of her house where she watched 'a silver Impala looking car' or Monte Carlo going westbound on Washington. Montiel heard between 12 and 15 gunshots and assumed the gunfire originated from the silver car because the passenger door was open as the car drove by. Montiel saw two black men inside the car, but she could not identify either man. Montiel immediately called 911.

"The first officer to respond, Officer Glenn Jay Carter, found Mitchell and Josenberger lying on the ground outside the barbershop. Josenberger was dead and Mitchell was screaming. In response to questioning from Carter, Mitchell said he was getting a haircut when two guys came in and started shooting. However, Mitchell told Carter he did not know who shot him. According to Carter, Mitchell was coherent but was primarily concerned with getting medical attention.

"Mitchell testified at trial regarding his prior relationship with Dobbs and his recollection of the shooting and events following the shooting. Mitchell, who was 23 years old at the time of trial in 2009, testified he went to high school with Dobbs and Ellis and had known them since the ninth or tenth grade. Mitchell identified both defendants in the courtroom and said he had been 'cool' with Ellis in high school until Ellis began a friendship with Dobbs.

"Mitchell testified he was sitting in a chair at TJ's Barbershop getting a haircut when he saw Dobbs walk through the door. Mitchell testified Dobbs wore a hat on his head and a bandana on his face and Mitchell could see only the space around his eyes. Mitchell could not recall the color of the hat or the bandana, nor could he recall the clothing worn by Dobbs. According to Mitchell, Dobbs carried some kind of assault rifle, probably an AK-47 or AR-15.

3

"Upon seeing the gun, Mitchell took off running and told Josenberger to run. Mitchell followed Josenberger out the back door of the barbershop. Mitchell heard 12 or 13 shots and was shot at least once before stumbling out the door. Outside, Mitchell saw Josenberger lying on the ground and ran past his body before being 'shot some more' and falling to the ground.

"Dobbs then approached Mitchell, stood over him, and attempted to shoot him again. Mitchell heard a 'click, click, click,' and he assumed Dobbs' gun was empty. Mitchell testified that by that point, the bandana had fallen from Dobbs' face and Mitchell got a good look at Dobbs as he stood over him. Mitchell testified he had '[n]o doubt' that Dobbs was the gunman.

"After Mitchell heard the gun click, he closed his eyes so Dobbs would believe he was dead. When Dobbs ran off, Mitchell opened his eyes and saw Dobbs get into a Monte Carlo that Mitchell recognized as belonging to Dobbs' brother. Mitchell could see Casey Ellis driving the Monte Carlo, and he watched it go west on Washington Boulevard.

"Mitchell recalled talking to an officer about 5 minutes after the Monte Carlo drove off and asking for an ambulance. However, he could not recall telling the officer that two men entered the shop and started shooting. Mitchell also testified he identified Dobbs and Ellis from two separate photo lineups during a subsequent interview with detectives.

"On cross-examination, defense counsel attempted to impeach Mitchell's identification of Dobbs and Ellis, pointing out that Mitchell made various statements to detectives explaining how he had been able to identify Dobbs and that he used uncertain language in his identifications, including indicating the gunman 'looked like' Dobbs. Defense counsel also emphasized that Mitchell made inconsistent statements regarding whether Dobbs wore a hat on the day of the shooting and about whether the bandana covered Dobbs' nose. Finally, in response to defense counsel's questioning regarding prior convictions involving truth or veracity, Mitchell conceded he had two juvenile adjudications, one for burglary and one for theft.

"On redirect, Mitchell clarified that although he used various statements to describe how he knew or recognized Dobbs and Ellis, he did not intend to imply that he was uncertain about his identification of either defendant.

4

"Claude Harper, a crime scene investigator, processed and videotaped the crime scene, took photographs, and collected evidence. Harper identified a photograph of a blood smear on the sidewalk in front of the barbershop and two swabs taken from that blood smear. Harper also identified other evidence found at the scene, including a bloody earring, several fired cartridges, a bullet fragment, and a live .223 caliber Remington PMC cartridge. Harper testified that based on his training and experience, all of the cartridges discovered at the scene were consistent with ammunition used in a military-type rifle such as an AR-15 or M-16.

"Detective Bryan Block testified he obtained DNA samples from Dobbs, Mitchell, and Josenberger, but that testing of the samples did not link Dobbs to the crime scene. Testing revealed that Mitchell's blood matched the blood smear on the sidewalk in front of the barbershop and the blood on the earring found at the scene.

"Based on witness reports, Block located the vehicle used in the homicide and identified the owner of the vehicle as Dobbs' brother, [Deon] Dobbs. Block testified officers found some type of 'magazine pouch' in the Monte Carlo and that the pouch could be used to hold a gun magazine.

"Block interviewed Mitchell at the hospital 12 days after the shooting. According to Block, although Mitchell was in pain and on medication, he was coherent and able to talk. During the interview, Mitchell identified Dobbs as the gunman and Ellis as the driver, and he seemed certain about both identifications." 297 Kan. at 1227-32.

In addition to the evidence presented, several other facts about Dobbs' trial are relevant to his current claim. At the preliminary hearing, Ellis' attorney, Frank Martin, asked Mitchell if he was under the influence of drugs or alcohol at the time of the shooting. Mitchell responded, "No. I don't smoke or drink anything. Cigarettes." But less than a week before trial, the defense attorneys received Mitchell's medical records from the time he was in the hospital after the shooting. One of those records included Mitchell's hospital intake form. That form showed that Mitchell drank beer weekly and used marijuana. The hospital had also performed a urinary drug screen that came back positive. Highland subpoenaed the hospital records clerk, but he did not hear from her before the start of trial.

5

On the first day of trial, the district court took up the State's motion in limine to prevent the defense from addressing whether Mitchell was under the influence of drugs or alcohol at the time of the shooting. Highland explained that he wished to use information from Mitchell's intake form to impeach Mitchell as well as to show that Mitchell may have been under the influence at the time of the shooting.

The State responded that a urine drug screen may come back positive if someone had smoked marijuana any time within the past 21 days. Because the positive drug screen could only show that Mitchell had used marijuana within 21 days of the shooting, the State argued it was irrelevant to whether he was under the influence at the time of the shooting.

The district court ruled that evidence of Mitchell's alcohol and drug use was inadmissible to show he was under the influence at the time of the shooting based on the current record. The court also ruled that Highland and Martin could ask Mitchell if he had told the admitting nurse that he used drugs or alcohol. But if Mitchell denied it, they could not use the form to impeach him without getting a witness to lay the foundation for the form. The court conveyed it was willing to grant a continuance to allow the defense to collect more evidence.

The district court then addressed the State's motion in limine to prevent testimony that either the defendant or the victims had any gang affiliations. Highland told the court that he was only going to have one or two witnesses. He had asked them both if they were in a gang, because Highland did not want to put them on the stand if they were. Both potential witnesses denied they were. Highland also said he would not be calling some witnesses on his list because he "believe[d] they would be involved." The court ultimately granted the motion.

6

By the second day of trial, the defense attorneys had learned that the State had been unable to serve subpoenas on one of its witnesses, Marcus Hayes, and he had not shown up for their pretrial conferences the week before trial. Hayes had been in the barbershop at the time of the shooting. Highland advised Dobbs to request a continuance so Highland could secure someone to lay a foundation for the intake form and try to find Clark and Hayes. But Dobbs chose to go forward with the trial.

That same day, Dobbs also told the court that Highland had not come to visit him the week before trial. Dobbs said he was not asking to have Highland replaced nor was that his intention in bringing his complaint to the court's attention. He simply wanted it on the record. He reiterated that he wanted to proceed with the trial, and he wanted Highland to represent him.

At trial, Highland and Martin both asked Mitchell if he remembered the nurse asking him if he used drugs or alcohol. He said he did not. He also explained that he had quit smoking and drinking several weeks before the preliminary hearing. That was why he said he did not smoke or drink. The intake form was never admitted into evidence.

After the State rested, neither Highland nor Martin gave an opening statement. They also called no defense witnesses.

The jury ultimately acquitted Ellis of all charges, but found Dobbs guilty of first-degree premeditated murder, attempted first-degree premeditated murder, and criminal possession of a firearm. At sentencing, the district court denied Dobbs' motion for a new trial. The court sentenced him to life imprisonment without the possibility of parole for 25 years for the first-degree murder conviction and a consecutive controlling prison sentence of 155 months for the other two convictions.

After the Kansas Supreme Court affirmed Dobbs' convictions and sentence on direct appeal, Dobbs filed a K.S.A. 2017 Supp. 60-1507 motion. He raised many claims, including that Highland had provided ineffective assistance of counsel. He argued Highland had been ineffective for 18 reasons, including that Highland had failed to present Dobbs' alibi defense; failed to get information about Mitchell's drug and alcohol use before the jury; had waived opening statement; his voir dire was inadequate; and he refused to let Dobbs testify. Dobbs' K.S.A. 2017 Supp. 60-1507 counsel filed a supplemental brief highlighting these arguments as well as addressing Highland's failure to call several other defense witnesses.

The district court held an evidentiary hearing on Dobbs' motion. The judge who presided over Dobbs' trial also presided over the hearing. The court took judicial notice of the records from the trial, and Dobbs presented several witnesses, including Highland.

Highland testified he had been a criminal defense attorney for 27 years. He finished law school in 1990, and Dobbs' trial was in 2009. The district court had appointed Highland to represent Dobbs, and that trial was not his first homicide defense. Highland had a limited memory of the specifics of Dobbs' trial, because the trial had happened 9 years before the evidentiary hearing, and he no longer had the file for Dobbs' case.

Highland testified he always read through the discovery in his cases himself. If he found something that might help his client, he investigated it. He said he also went through discovery with all of his clients, so they could decide whether to accept a plea agreement or go to trial.

Highland did not recall how many times he had visited Dobbs before trial. According to an inmate visitation summary, Highland had visited Dobbs in jail twice: once before the preliminary hearing for 32 minutes, and once on the second day of trial.

Highland did not dispute the information in the summary, but said he must have seen Dobbs at some hearings. Highland also admitted that 32 minutes would probably not have been enough time to go over the evidence in a murder trial. But he added that some clients do not want to go over the discovery and just want to talk about what is going to happen.

The discovery in Dobbs' case included a statement from Randall Shields. In that statement, Shields named several people other than Dobbs who may have had a motive for killing Josenberger. Highland did not remember Shields' statement, but said he must have read it if it was in the discovery. He also did not remember talking to Shields and admitted he probably did not talk to the officer who took Shields' statement. He said that he was sure he read the statement and spoke with someone about it at the time. He "must have determined that they weren't viable candidates," but he could not remember why.

Highland also did not remember talking to anyone about Keith Wright, another potential suspect in the case. He testified that he had not gone out to try to find Wright. He also agreed he had not asked about Wright at trial.

Highland did remember spending several hours with Martin on a few occasions preparing for trial. They went through discovery together and tried to figure out a defense. He also remembered driving to the barbershop with Martin and investigating the area. His strategy at trial was to put the State to its proof and attack Mitchell's credibility.

Highland "[v]aguely" remembered that at the start of the trial he learned that the State was not going to call Clark and Hayes. Highland remembered that he had not subpoenaed either of those witnesses. But he could not remember if he talked to Dobbs about continuing the trial so he could find them.

9

Highland said he had read Dobbs' motion stating that Highland's voir dire only took up six pages of the trial transcript. He did not know how long the State's voir dire was, but he "assumed it was very, very lengthy and covered most everything." He said that if the State had already covered something in its voir dire, he did not like to ask the same questions because he did not want to "turn the jury against [his] client for wasting their time."

Highland testified that he was not surprised that he had not given an opening statement. He explained he did not like to give an opening statement before the State's case-in-chief, because he did not want to harm his client by incorrectly stating what the evidence would be. He usually waited until the State rested to give an opening statement. Even then, he might decline to do so if he thought the State had not proven its case.

Highland admitted he filed a notice of alibi, listing eight potential witnesses who would testify Dobbs was at a funeral or with other funeral attendees at the time of the murder. He and Ellis' attorney had investigated the potential alibi, but he did not find it credible. He also remembered talking to Deon and Dobbs' mother, Davilyn. He did not believe the proposed witnesses would be helpful. He could not remember filing the notice of alibi but explained he may have done it just to have it on file.

Highland did not remember if he talked to Dobbs about testifying. He disputed that he had told Dobbs not to testify, because he had never done that. He acknowledged that deciding whether to testify is one of the few decisions a defendant could make, and "I would never tell [Dobbs] that I would not allow him to."

Dobbs also testified at the hearing. He told the court that on the day of the murder, he had gone to his friend's funeral at a church at 8th and Washington and spent the rest of the day with friends and family. The funeral service started at 11 a.m. After the service,

10

he stayed in the church parking lot socializing for one or two hours. Deon then drove him to his friend's aunt's house on 12th Street.

Dobbs said he returned to the church around "4:00 or 4:15" and had another meal. He then helped clean up the church and went with Deon to take a friend home. Deon then dropped Dobbs off at Davilyn's home, and Deon went to pick Davilyn up from work. Dobbs spent the rest of the night at Davilyn's.

Dobbs said that Highland had come to talk to him in jail on the second day of trial. At that meeting, Highland said he did not think they should present the alibi defense because "the prosecutor would catch them up in their testimonies." He asked if Highland had spoken with the witnesses, and Highland said no. But Dobbs later testified that Highland did not tell him at that meeting whether he had spoken to the witnesses and did not explain why he was not going to call them.

Dobbs said he had intended to testify at his trial. He told Highland he wanted to testify if Highland was not going to call his alibi witnesses. But Highland never prepared him to testify. Dobbs also said Highland had told him testifying was not a good idea and he should not do it. Dobbs said Highland never told him he had a constitutional right to testify and the decision was ultimately his to make.

Dobbs testified that Highland came to visit him in jail one time before trial. He asked Highland to come more, and he wrote Highland several letters, but Highland never answered them. Dobbs also testified he never saw the discovery in his case. He asked Highland to see it at least four times. But Highland never let him see it and did not explain why. Dobbs had not heard of Shields, Wright, or Hayes before his trial.

Dobbs testified that he had a conversation with Highland in the holding cell at sentencing. Highland asked if Dobbs was upset with him, and Dobbs said he was not.

11

Highland said that when Dobbs filed an appeal, he could argue Highland was ineffective. Dobbs did not know why Highland had said that.

Four of the eight witnesses listed in Dobbs' alibi notice also testified at the hearing. Deon stated he was at Davilyn's home the morning of the shooting. He also remembered going to a funeral that day. He said Highland never talked to him about a possible alibi for Dobbs.

Marvin Dudley testified that he was with Dobbs all day on the day of the murder. He said he would have been willing to testify, but nobody came to talk to him, including the police. Dudley said he was with Dobbs when Dobbs was arrested. He also knew then that Dobbs had been arrested for homicide. He believed that if he had made a statement to police, Dobbs would have been released. But he did not do so.

Davilyn testified that on the day of the murder, Deon picked her up from work in his gray four-door Monte Carlo. She usually got off work at five o'clock. When they got back to her house, Dobbs was there. She said she never spoke with Highland about being a potential witness. She said she had called Highland several times and had left three messages for him at his office. But he never returned her calls.

Jawan Robinson said he went to the funeral with Dobbs. After the funeral, they hung out for a bit at the church, and then Dobbs took Robinson home in the afternoon. He did not know the exact time he went home. He also did not remember if Dobbs was driving or what car they were in. Robinson said he never spoke to Highland before the trial, but he had a brief conversation with Highland in the hallway outside the courtroom during the trial.

Dobbs also called two other witnesses at the hearing: Shields and Martin. Shields testified that police had come to talk to him during their investigation. They asked

12

Shields if he might know who shot Josenberger. Shields said a group of people had approached him and Josenberger outside a club a few weeks earlier, and they threatened Josenberger. In his original statement, Shields gave police the names of the people in that group. But at the evidentiary hearing, Shields denied giving any names. He also denied knowing any of the people listed in his statement. He added that he did not know who shot Josenberger.

Martin testified that he also did not have a "strong recollection" of the trial or his preparation for the trial. He did not remember working with Highland "to any great extent" to prepare their defenses He did remember spending about 30 to 45 minutes with Highland at the barbershop. He was also sure he had had some conversations with Highland. But he could not remember what they were about.

Martin had also filed an alibi notice, but he had not presented an alibi defense at trial. (He remembered talking to some witnesses and reviewing some photographs. But he did not remember why he pursued no alibi defense at trial.

The district court ultimately denied Dobbs' motion. The court found that Dobbs had failed to establish prejudice because of Highland's failure to call Shields, because Shields did not know who shot Josenberger. Likewise, Dobbs had failed to establish prejudice because of Highland's failure to subpoena Hayes because Dobbs chose not to ask for a continuance.

As for Highland's failure to present any alibi witnesses, the district court held Highland had made a strategic decision based on a reasonable investigation. The court continued that Highland's advice to Dobbs not to testify was based on this investigation.

The district court found that the cross-examination of Mitchell was extensive. Mitchell was questioned about every inconsistent statement he made. According to the

13

court, both Highland and Martin did a good job. The district court also held that Highland made a strategic decision about the length of voir dire and whether to give an opening statement. The court continued that Highland covered many of the important topics for the defense in his voir dire, and the State's voir dire was also extensive.

The district court emphasized that counsel must be granted some deference. The court also highlighted the strengths of the State's case, noting that Mitchell had identified Dobbs as the shooter and it was up to the jury to determine his credibility.

Dobbs appeals.

To begin with, Dobbs raised several claims in his K.S.A. 60-1507 motion which he does not raise on appeal. As a result, Dobbs has waived and abandoned these issues. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016).

*Failure to Present Defense Witnesses*

On appeal, Dobbs argues the district court erred in denying his claim of ineffective assistance of counsel. He first argues that Highland was ineffective because Highland failed to call several witnesses at trial. He contends that Highland should have called Shields, Hayes, Wright, and his alibi witnesses.

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the district court conducts a full evidentiary hearing on such claims, this court determines whether substantial competent evidence supports the district court's findings and whether those factual findings support the court's legal conclusions. This court applies a de novo standard to the district court's conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

14

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

Generally, "'[i]t is within the province of a lawyer to decide what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions.' [Citation omitted.]" *Sola-Morales*, 300 Kan. at 887. If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013). "The defendant bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy." *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004).

*Failure to Subpoena Wright*

First, Dobbs argues Highland erred in failing to call Wright as a witness. At the evidentiary hearing, Dobbs produced a canceled pickup order from the Kansas City, Kansas Police Department for Wright, showing Wright was a suspect in the case. Highland's testimony suggests Highland did not speak with Wright. But Dobbs has failed to show prejudice because he has proffered no testimony from Wright.

*Failure to Subpoena Shields*

Next, Dobbs argues Highland erred in failing to call Shields. Highland testified that he could not specifically remember reading Shields' statement but he was sure he had looked into it. He said he must have decided it did not warrant any more investigation, but he could not remember why. Shields testified that Highland never came to talk to him. Based on this evidence, we cannot readily conclude that Highland did the necessary investigation to make the strategic decision not to call Shields as a witness.

That said, the district court properly found that Highland's failure to call Shields did not prejudice Dobbs. Shields was not an eyewitness to the crime, and he did not know who had killed Josenberger. In his original statement, Shields had given a list of people who may have had motive to kill Josenberger. But at the evidentiary hearing, Shields denied giving those names and denied knowing the people listed. He merely testified a group of unknown people had gotten into a fight with Josenberger a few weeks before the shooting. This evidence is unlikely to have detracted from Mitchell's eyewitness identification.

As the State also points out, Shields testimony was likely inadmissible. "[W]ithout additional evidence showing that a third party could have committed the crime . . ., evidence merely suggesting that someone other than the defendant had a motive to commit the crime has little probative value and can be properly excluded at trial." *State v. Burnett*, 300 Kan. 419, 432, 329 P.3d 1169 (2014). Shields could only testify that

16

someone else may have had a motive kill Josenberger. Dobbs had no other evidence to support this theory.

*Failure to Subpoena Hayes*

Next, Dobbs argues that Highland should have personally subpoenaed Hayes. Dobbs claims Hayes' statement was critical to his defense because Hayes "gave a description of the killer that was entirely different than what the defendant looked like." In his statement to police, Hayes said he would not be able to identify the shooter from a photo, but described him as kind of tall, with a kind of medium build, and braids. At the evidentiary hearing, Dobbs testified that he was 5'8 and weighed 260 pounds when he was arrested. He had short hair at the time, and he had never had braids.

The district court declined to find if Highland was deficient for failing to subpoena Hayes personally. Instead, the court found that Highland's failure did not prejudice Dobbs. The court noted that Dobbs had the opportunity to ask for a continuance once he learned Hayes was not going to show up for trial. But Dobbs chose to go on to trial against Highland's advice.

Granted, Highland admitted that he did not personally subpoena Hayes. But Dobbs has not shown that Highland was unreasonable in failing to do so. The State suggests that it would have been reasonable for Highland to believe that the State would be able to produce Hayes for trial.

Even if Highland's performance were deficient, Dobbs has failed to show prejudice. For one, he has not shown that Highland would have been able to serve Hayes with a subpoena when the State could not. Nor has he shown that Hayes would have appeared if Highland had personally subpoenaed him.

Hayes also did not testify at the evidentiary hearing, so we do not know for sure what he would have said at trial. But assuming his testimony would have been consistent with his statement, it likely would not have changed the verdict. Hayes could not identify the shooter, and his description was fairly vague. The three other eyewitnesses also testified or provided statements describing the shooter as having a medium build. And while Hayes said the shooter had braids, the other three eyewitnesses said the shooter was wearing a hat.

*Failure to Subpoena Alibi Witnesses*

Dobbs next argues that Highland was ineffective because he did not call Dobbs' alibi witnesses. But the district court found that Highland had made a reasonable strategic decision not to present these witnesses. The evidence supports this finding. Highland testified that he had investigated Dobbs' proposed alibi and found it was not credible. He believed the alibi witnesses were weak. He did not believe their statements because "the timeline was just too far apart." He said they likely would not have withstood the State's cross-examination, and he believed they would have hurt Dobbs' defense.

But even if Highland had erred in failing to call Dobbs' alibi witnesses, Dobbs has not shown prejudice. The evidentiary hearing showed that Dobbs had weak alibi witnesses. "An alibi places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for the accused to be the guilty party." *State v. Pham*, 234 Kan. 649, 656, 675 P.2d 848 (1984). None of the witnesses who testified at Dobbs' evidentiary hearing could definitively place Dobbs at another location at the time of the shooting.

For instance, Davilyn testified that Dobbs was at her home after she got back from work sometime after five. But the shooting happened sometime between 4:10 and 4:30. She did not say anything about where Dobbs had been before she got home. She also did

18

not testify that Deon could not have made it in time to pick her up in his car if his car was involved in the shooting.

Robinson, Dudley, and Deon also provided vague testimony. Robinson testified he was with Dobbs on the day of the shooting but could not provide specific details, like what time Dobbs took him home or who was driving. His testimony also appeared to conflict with Dobbs'. Robinson said they hung out at the church for a bit before Dobbs took him home. But Dobbs testified that he left the church, came back, and then took his friend home.

Likewise, Dudley testified he was with Dobbs "all day," but he gave no specific times. Nor did he say where they were. Finally, Deon testified that he went to the funeral that morning, but he did not say anything about being with Dobbs or where Dobbs was at the time of the shooting in the afternoon.

The credibility of Deon and Dudley would have also been susceptible to question at trial. In *State v. Miller*, 259 Kan. 478, 482, 912 P.2d 722 (1996), the Kansas Supreme Court held that the State may test the credibility of an alibi by noting the alibi witnesses' delay in coming forward to exonerate the defendant and the defendant's delay in contacting the alibi witness.

> "'While it is generally true that a defendant is under no obligation to present evidence in his defense prior to time of trial, it does seem natural that a person who knew facts which would protect a defendant, particularly a family member, would come forward when the opportunity existed rather than remain silent. [Citation omitted.] This silence raises proper concern for the credibility of the story and is a proper subject of inquiry.' [Citation omitted.]" 259 Kan. at 482.

At the evidentiary hearing, Dudley testified that he did not disclose what he knew to police, even though he believed Dobbs would have been released if he had done so.

19

And at trial, Detective Block testified that he tried to get a statement from Deon, Dobbs' brother, but Deon would not come in to give one. See *Miller*, 259 Kan. at 480-82 (finding State did not err in impeaching alibi witnesses using "their own failure to come forward with an alibi that might have secured [the defendant's] release").

As a final point, while Highland had limited memory of his trial preparation, the record of the trial shows Highland investigated witnesses. During the discussion of the State's motion to keep out evidence about any gang affiliations, Highland told the court he had spoken to several witnesses and was intending to call some of them. And both Jackson and Campbell testified that Highland had talked to them before trial. Dobbs has therefore failed to show that Highland was ineffective for not calling these witnesses.

*Failure to Impeach a Witness*

Dobbs argues that Highland failed to impeach Mitchell properly. He asserts that Mitchell "lied to the police about having drugs in his system at the time of the shooting." Dobbs' argues that Highland failed to impeach Mitchell properly because "[he] was not able to get this information into the record for the jury to consider." He adds: "That failure was highly prejudicial because had the jury known that Mitchell not only lied to police, but was under the influence of drugs at the time of the shooting, his testimony could have been disregarded by the jury, thus changing the verdict."

The record does not show that Mitchell was under the influence of alcohol or drugs at the time of the shooting. Nor does it show that Mitchell ever lied to police. Dobbs is presumably referring to the conflicting statements about Mitchell's drug and alcohol use from the intake form and at the preliminary hearing. But Dobbs has provided no evidence or argument on how Highland should have been able to get this information before the jury.

20

All the same, Highland's cross-examination was extensive. Highland introduced all of Mitchell's other inconsistent statements. He asked Mitchell about his inability to identify the shooter when police first arrived on the scene. He asked Mitchell why he had testified at the preliminary that Dobbs was not wearing a hat, but testified at trial that Dobbs was wearing a hat. He also asked why Mitchell had said the shooter "looked like" Dobbs when he gave his statement to police two weeks after the shooting. And Highland asked why when police asked him how he knew it was Dobbs', Mitchell responded "'cause there have been too many incidents before."

The district court also added in its finding: "Everything was done very well. . . . I thought both [Highland and Martin] did a good job." And because the judge who ruled on Dobbs' motion also presided over his trial, he was in a unique position to determine whether Highland's cross-examination had been deficient. See *Rowland v. State*, 289 Kan. 1076, 1084, 219 P.3d 1212 (2009) (noting that in an ineffective assistance of counsel claim that district court judge who presided over proceedings is "usually . . . in the best position to judge the merits of many such claims"). Dobbs has failed to show that Highland was ineffective on this point.

*Failure to Investigate Alibi Before Advising Defendant Whether to Testify?*

Before the district court, Dobbs argued that Highland had prevented him from testifying. But for the first time on appeal, Dobbs argues that Highland failed to do the investigation necessary to advise him whether to testify. Generally, a party may not assert a new legal theory for the first time on appeal. *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). While there are exceptions to this rule, Dobbs has not explained why we should address his argument for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015); *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

21

That said, his claim lacks merit. Counsel may perform deficiently in advising a defendant not to testify if that advice is not based on a reasonable investigation. *State v. Rice*, 261 Kan. 567, 606-07, 932 P.2d 981 (1997). For example, in *Rice*, the Kansas Supreme Court found that trial counsel, who was not licensed in Kansas, performed deficiently in advising the defendant not to testify based on a flawed understanding of Kansas evidentiary rules instead of "any justifiable strategic considerations." 261 Kan. at 607.

Dobbs' briefly cites *Rice* in his brief, but his case is distinguishable. Here, the district court found that Highland had conducted a reasonable investigation into Dobbs' alibi defense and had found it wanting. Highland then made a strategic decision in advising Dobbs not to testify. Dobbs thus has not established deficient performance.

As for his prejudice argument, Dobbs provides only a conclusory sentence, declaring that Highland's deficient performance prejudiced him "by resulting in an improper conviction and sentence." Granted, if Dobbs had testified, he would have provided himself an alibi, which could have been helpful given there were no other defense witnesses. That said, Dobbs would have testified he was at a church function at the time of the shooting, but has been unable to produce any witnesses who could corroborate his story. Additionally, Dobbs' alibi would have put him in the vicinity of the shooting at the time of the shooting with the getaway car. If Dobbs did not do well under cross-examination, he could have done as much harm as good. Thus, he has failed to show there is a reasonable possibility of a different outcome.

*Cumulative Error*

Also, for the first time on appeal, Dobbs argues that Highland's cumulative errors deprived him of effective assistance of counsel. Again, Dobbs has not explained why we

22

should hear his argument for the first time on appeal. All the same, this claim also lacks merit.

The cumulative effect of trial counsel's individual errors may support an ineffective assistance of counsel claim. *State v. Thompson*, 293 Kan. 704, 721, 270 P.3d 1089 (2011); *Hunt v. State*, 48 Kan. App. 2d 1023, 1046, 301 P.3d 755 (2013). In analyzing such a claim, Kansas courts have applied the test for cumulative trial errors. *Thompson*, 293 Kan. at 721; *Hunt*, 48 Kan. App. 2d at 1046. Under that test, we must determine whether the totality of the circumstances establish that defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

In this issue, Dobbs' raises three new errors not discussed before: Highand's failure to visit or communicate with him; Highland's inadequate voir dire; and Highand's failure to give an opening statement. Dobbs argues that Highland "only visited him twice despite Dobbs' numerous requests for a visit." He also "failed to ask the jury basic questions about their previous trial experience, their thoughts on the charges, alibi witnesses, defense objections, and other matters that are pertinent to a proper voir dire." He adds that "Highland's trial deficiency was perhaps most evident when he waived making an opening statement in the case, a practice that is almost unheard of amongst qualified defense attorneys."

At the evidentiary hearing, Highland did not dispute the inmate visitation summary showing that Highland visited Dobbs in jail only twice. As the district court pointed out, though, Dobbs had a chance before trial to lodge any complaints he may have against Highland. Dobbs only complaint was that Highland did not visit him the

23

week before trial. He did not tell the court that Highland had barely visited at all or that Highland was not communicating with him. And when the court asked if Dobbs wished to proceed with Highland's representation, Dobbs said he did.

As for Highland's voir dire, it was short, taking up only six pages of the trial transcript. In comparison, Martin's voir dire took up 25 pages, and the State's voir dire took up almost 200 pages. But Highland testified that he usually has a short voir dire for strategic reasons. And the district court found that Highland covered the most important points for the defense, such as the presumption of innocence and the State's burden of proof. Highland's voir dire was not deficient.

As for any possible prejudice, the district court found that the State's voir dire was extensive, and it "always does a pretty good job of hitting all of the points that are necessary, including points for the defense." The State also covered some points that Dobbs argues Highland should have covered, including if the jurors knew any homicide victims; if the jurors knew someone who had been arrested, charged, or convicted of homicide; and how to treat objections from either party.

As for Highland's failure to give an opening statement, the district court again found this was a strategic decision. And at the evidentiary hearing, Highland explained why he might choose to forgo an opening statement. While Dobbs claims this is "almost unheard of," he has provided no evidence that Highland's performance was deficient. Nor has he explained how this deficiency prejudiced him. See *State v. Orr*, 262 Kan. 312, 330-31, 940P.2d 42 (1997) (finding that while record was inconclusive on whether trial counsel's failure to give opening statement was deficient, defendant had still failed to show prejudice).

Most of Dobb's alleged errors resulted from Highland's trial strategy and thus do not constitute deficient performance. To the extent that Highland's performance involved

24

any errors, those errors, when considered cumulatively, did not substantially prejudice Dobbs. While other defense counsel may have chosen a different strategy in defending Dobbs, the *Strickland* standard imposes a "highly demanding" burden on Dobbs to prove "gross incompetence." *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). Based on the record before us, Dobbs has not met this burden.

Affirmed.